# Exhibit A

# KIMBALL
Claimant

## vs

# SCOTTRADE
Respondent

## Table of Contents

1. STATEMENT OF CLAIM

2. EXHIBITS

Jan E. Harris-Kimball
Jan E. Harris-Kimball  ROTH IRA ("ROTH IRA") and
Jan E. Harris-Kimball Traditional IRA ("TRAD IRA")

Claimant

vs

Scottrade Inc,
A wholly-owned subsidiary of
Scottrade Financial Services, Inc., member FINRA and SIPC.

Respondent

Claimant submits this statement of claim against Respondent for breach of contract.
Respondent is a sophisticated brokerage firm, Claimant is a customer of Respondent,
and their relationship is governed by contract.

In August 2005, Claimant directed Respondent  to purchase shares of Bancorp
International Group, Inc., ("BCIT") in her ROTH IRA account, ("ROTH IRA"), and her
Traditional IRA account, ("TRAD IRA").  Respondent removed funds from Claimant's
accounts and created 'security entitlements' for BCIT in those accounts.
Once the security entitlements were established in Claimant's accounts, Claimant had the
right, by implied and express terms of their contract, to exit the indirect holding system
and obtain physical possession of certificates for the common stock of BCIT.

In June 2008, at the Annual Shareholder Meeting, Bancorp International Group, Inc.
changed it's name to Energy Source Inc., and on November 3, 2009, when the Securities
and Exchange Commission revoked the registration of BCIT shares due to failure to file
timely periodic reports, Energy Source Inc. ceased to be a publicly traded company.

Claimant notified Respondent in a letter dated December 29, 2009, that Claimant wanted to exit the indirect holding system and obtain physical possession of the stock certificates for the BCIT shares in her ROTH IRA account. After attempting to comply with her initial request, Respondent was not able, through it's usual channels, to obtain shares and subsequently denied Claimant's request. Claimant reiterated her request in a letter dated January 29, 2010. Respondent again denied the request.

In a letter dated June 6, 2010, Claimant reiterated her request again and in addition, requested that the BCIT shares in her TRAD IRA account also be directly registered. Respondent again denied Claimants requests.

As justification for denying Claimant's requests, Respondent stated it was "impossible" to obtain certificates for Energy Source Inc. due to a Depository Trust and Clearing Corporation ("DTCC") "global lock".

It is true, there is a DTCC 'global lock' on BCIT shares, however, that 'global lock' has been in effect continuously since August 11, 2005. On August 18, 2005 and August 29, 2005, when Respondent established the BCIT security entitlements in Claimant's accounts, Respondent had knowledge of the 'global lock' in effect and voluntarily assumed the risks associated with executing trades outside the DTC system and the contractual obligations associated with establishing security entitlements. It may be "impossible" for Respondent to get BCIT certificates from the Depository Trust Company ("DTC"), a subsidiary of the DTCC, however, it is not "impossible" to obtain BCIT Energy Source Inc. shares.

Respondent has a contractual and statutory duty to obtain and deliver the shares Claimant has requested and is entitled to.

> *"In short, if a broker has purchased 100,000 shares of XYZ stock for its customers, it must have that amount of XYZ stock available if those customers wish to sell or obtain share certificates. How is this statutory duty to be performed? Under 8-504(c)(2), in absence of agreement, it must be performed with due care in accordance with reasonable commercial standards, or under 8-504(c)(1), as agreed upon with its customer"... ... "8-504 Comment 4. However, the agreement, consistent with good faith and applicable government regulation, might provide that if another broker fails to make a delivery there is a certain period of time in which to clear up the problem before the acquiring broker is obligated to obtain the necessary securities from another source."*
> The ABC's of the UCC: General Provisions By Frederick H. Miller, Amelia H. Boss

**4**

When an intermediary establishes a 'security entitlement', as Respondent did for BCIT in Claimants IRA accounts, that intermediary is subject to certain obligations which are set forth in Article 8 of the U.C.C.

> *"the inception of a security entitlement is a generally consensual process that generates legally enforceable obligations"*
> *Carl S. Bjerre & Sandra M. Rocks, The ABCS of the UCC Article 8:Investment Securities p.38*

> The five core obligations are:

8-504  Duty to Maintain Financial Assets.
8-505  Duty to Obtain Payments or Distributions
8-506  Duty to Exercise Rights as Directed
8-507  Duty to Comply with Entitlement Orders
8-508  Duty to Change Position to Other Form of Holding

> *"These obligations constitute the core of the entitlement holder/securities intermediary relationship and if breached, give rise to in personam liability of the securities intermediary."*
> *Carl S. Bjerre & Sandra M. Rocks, The ABCS of the UCC Article 8:Investment Securities p.41*

Respondent  implied, when it created  the  security entitlements in Claimants accounts, that it intended to perform all the contractual obligations associated with those entitlements. By refusing to change the form of holding and directly register Claimant's shares, Respondent has failed in it's duties under UCC 8-504, UCC 8-508, and SEC Rule 15c-3-3, consequently breaching implied and express terms set forth by the Account Agreement.

**Scottrade Account Agreement terms and conditions state:**

> *"You have the absolute right to receive, in the normal course of business, any free credit balance and any fully paid securities to which you are entitled, subject to any open commitments in your Account." (Paragraph 18.).*

> *"34. Applicable Rules and Regulations.  You acknowledge that this Agreement and all orders and transaction executed in your Account shall be subject to all applicable federal and state laws and regulations, and the constitution, rules , regulations, customs, usages, rulings and interpretations of the exchange or market and its clearinghouse (if any) where such transactions are executed." (Paragraph 34.).*

> *"We are required under SEC rule 15c3-3 to retain in our possession and control all fully paid-for securities." (Paragraph 61)*

Kimball vs Scottrade    Statement of Claim



## UCC 1-304, UCC 8-504, and UCC 8-508

*"It would not be consistent with the duty of good faith for the agreement to disclaim altogether this basic element of the relationship between the broker and its customers, such as by assuming no responsibility for maintaining any of its customers' security positions." The ABC's of the UCC: General Provisions By Frederick H. Miller, Amelia H. Boss CHAPTER FIFTEEN GOOD FAITH 1-304*

*8-504  Duty to Maintain Financial Assets.*

*"intermediaries' agreements with their entitlement holders are subject to the law of contracts,"*

*"Moreover, any obligations included in such contracts would be subject to 1-304's general obligation of good faith performance of contracts, and for purposes of Article 8, "good faith" is defined as requiring not only "honesty in fact" but also "observance of reasonable commercial standards of fair dealing" 8-102(a)(10).  Official Comments to 8-504 suggests that it would not be consistent with the obligation of good faith performance for an agreement to purport to establish the usual sort of arrangement between an intermediary and entitlement holder yet disclaim altogether one of the basic elements that define that relationship."*
*Carl S. Bjerre & Sandra M. Rocks, The ABCS of the UCC Article 8:Investment Securities p.44*

*8-508. Duty of securities intermediary to change entitlement holder's position to other form of security holding.*

*Official Comments to 8-508 " If security certificates in registered form are issued for the security, and individuals are eligible to have the security registered in their own name, the entitlement holder can request that the intermediary deliver or cause to be delivered to the entitlement holder a certificate registered in the name of the entitlement holder or a certificate indorsed in blank or specially indorsed to the entitlement holder."*

*"8-508.  This duty provides the entitlement holder with a means of exit from the intermediary relationship: he can switch to a different intermediary, or switch out of the indirect holding system entirely and obtain direct ownership of the financial asset."*
*Carl S. Bjerre & Sandra M. Rocks, The ABCS of the UCC Article 8:Investment Securities p.48*

## SEC Rule 15c-3-3(l)

*"l. Delivery of securities.*
*Nothing stated in this section shall be construed as affecting the absolute right of a customer of a broker or dealer to receive in the course of normal business operations following demand made on the broker or dealer, the physical delivery of certificates for:.....Fully-paid securities to which he is entitled, and,..."*

Kimball vs Scottrade    Statement of Claim

Although Respondent points to the DTCC 'global lock' as the reason for their non-performance, Respondent has not established that it has rights to any legitimate BCIT shares held in custody by the DTC.  If Respondent does not have rights to legitimate shares held in custody at the DTC, then it is disingenuous for Respondent to point to the DTCC 'global lock' as a reason for non-performance. Whatever the status of their holdings at the DTC,  the legal structure of the multi-tiered indirect holding system effectively makes Respondent a guarantor of any upper-tier intermediary.

> *"There may be more than two tiers of indirect holding for any financial asset. While this could be criticized as creating multiple levels of risk for the ultimate entitlement holder, these levels of risk are mitigated to a significant extent by the fact that Article 8 makes the immediate securities intermediary effectively a guarantor of any upper tier securities intermediaries."*
> Russell A. Hakes, UCC Article 8: Will the Indirect Holding of Securities Survive the Light of Day?, 35 LOY. L.A. L. REV. (2002))

> *"the efficiency of the indirect holding system is vindicated by forcing the entitlement holder to pursue its remedies only against the securities intermediary's based on the intermediary's in personam duties."*
> Carl S. Bjerre & Sandra M. Rocks, The ABCS of the UCC Article 8:Investment Securities p.60

Claimant requests the arbitration panel order Respondent, Scottrade Inc., as follows:

> To reimburse Claimant's  ROTH IRA account and Traditional IRA account for the cost to obtain the genuine Energy Source Inc. certificates that the BCIT entitlements represent;

To bear the cost of these proceedings;

That Claimant is granted all other and further relief as this panel deems just and appropriate.

Dated: 12/30/2010

Respectfully submitted,

Jan E. Harris Kimball

Jan E. Harris Kimball
PO Box 1387, Philomath, OR, 97370

# FACTS

In 2005, "BCIT" was the ticker symbol for Bancorp International Group, Inc.'s, common stock with the cusip number 05968X106.  In June 2008, Bancorp International Group, Inc. changed it's name to Energy Source Inc. The CEO was and still is Mr. Thomas Megas.

June ~~22~~ 2005,  FINRA informs SEC enforcement of fraudulent trading activity in BCIT.   (Regulators did not notify public of fraudulent activity until August 31, 2005.)

SEE EXHIBIT 15

August 16, 2005,  the Depository Trust Company (DTC) issued a Special Alert to Participants regarding the "global lock"

SEE EXHIBITS 9, 15

For two weeks after being officially notified by the DTC of the "global lock", FINRA member brokerages such as Respondent, TDAmeritrade, Etrade, Charles Schwab and others continued to execute customers purchase and sell orders for BCIT.

August 18, 2005, Claimant entered an online purchase order for 30,000 shares of BCIT in  Claimant's Scottrade ROTH IRA account # ████6084. Respondent removed funds from Claimant's account and created a securities entitlement for 30,000 shares of BCIT. Claimant received confirmation that the trade cleared and settled.

SEE EXHIBIT 10

August 29, 2005, Claimant entered an online purchase order for 50,000 shares of BCIT in Claimant's Scottrade TRAD IRA account # ████6083. Respondent removed funds from Claimant's account and created a securities entitlement for 50,000 shares of BCIT. Claimant received confirmation that the trade cleared and settled.

SEE EXHIBIT 12

The DTC "global lock" did not interfere with the purchase, sale, clearance, settlement or finality of BCIT trades between August 11, 2005 and August 30, 2005.

August 31, 2005, the SEC instituted a ten day trading suspension in BCIT common stock.

SEE EXHIBIT 14

When the ten day SEC suspension ended in September 2005, BCIT shares were again eligible to trade, however, the DTCC global lock remained.

October 2006   The Company files form 15c-211 with NASDAQ and FINRA (f/k/a NASD) for relisting on the OTCBB exchange.

October 23, 2006 the Company is relisted on the OTCBB exchange.
October 30, 2006 Trading resumed on the OTCBB, and closed at  $0.15.

BCIT

November 7, 2006, ~~Energy Source Inc.~~, is delisted from the OTCBB exchange.

June 3, 2008,   the Company holds its 2008 Annual Shareholder Meeting and changes it's name to Energy Source Inc.

November 3, 2009 the SEC revoked the registration of the shares of Energy Source Inc. (BCIT) by default for failing to file timely periodic reports, consequently, BCIT shares are no longer eligible for trading on a public exchange.

**SEE EXHIBIT** 16

When the SEC revoked the share registration on November 3, 2009, and BCIT became ineligible for trading on a public exchange, Claimant chose to change the form of her BCIT ownership from  indirectly held, (through an intermediary), to directly held on the issuers books.

December 29, 2009, Claimant requested the 30,000 shares of BCIT Claimant is entitled to in the "ROTH IRA" account be directly registered.

January 13, 2010, Respondent, in a letter, refused to directly register the "ROTH IRA" shares with Energy Source Inc. **This is the first breach of contract that gives rise to this claim for damages.**

**SEE EXHIBIT** 2

January 29, 2010, Claimant reiterates request.
February 25, 2010, Respondent again denies Claimant's request.

**SEE EXHIBIT** 4

June 6, 2010,   for a third time, Claimant requested the "ROTH IRA" shares be directly registered and in addition demanded the 50,000 shares in "TRAD IRA" account also be directly registered.

July 9, 2010,   Respondent, in a letter, again refused to directly register the "ROTH IRA" shares and also the 50,000 "TRAD IRA" shares. By additionally refusing to directly register the "TRAD IRA" shares, Respondent breached "TRAD IRA" contract giving rise to this claim for additional damages.

**SEE EXHIBIT** 6

October 9, 2010, Claimant wrote Respondent requesting a third party independent verification that the BCIT entitlements in all four of Claimant's accounts were backed by legitimate certificates and safeguarded at a custodian.
October 29, 2010, Respondent  replied.

**SEE EXHIBIT** 7

November 8, 2010, Claimant sent Respondent a "Notice of Intention to Arbitrate"
November 23, 2010, Respondent replied.

**SEE EXHIBIT** 8

# EXHIBIT LIST

**EXHIBIT 1**
Corporate Actions and Damages and
December 19, 2010 email from Energy Source Inc., CEO and President, Mr. Thomas Megas confirming
replacement value for cusip 05968X106.

**EXHIBIT 2**
December 29, 2009 initial certificate request from Claimant to Respondent and
January 13, 2010 Respondent denial.

**EXHIBIT 3**
January 26, 2010 email from Thomas Megas regarding quote for 30,000 shares.

**EXHIBIT 4**
January 29, 2010 letter from Claimant to Respondent and
February 25, 2010 Respondent reply.

**EXHIBIT 5**
May 25, 2010 email from Thomas Megas regarding share availability.

**EXHIBIT 6**
June 6, 2010 letter from  Claimant to Respondent and
July 9, 2010 Respondent reply.

**EXHIBIT 7**
October 9, 2010 letter from Claimant to Respondent and
October 29, 2010 Respondent reply.

**EXHIBIT 8**
November 8, 2010 "letter of intent to arbitrate" from Claimant and
November 23, 2010 Respondent reply.

**EXHIBIT 9**
August 16, 2005 Depository Trust Company (DTC) Special Alert.
http://www.dtc.org/impNtc/ope/ope_8418.pdf

**EXHIBIT 10**
August 2005 Trade confirmation for 30,000 BCIT shares cusip 05968X106.in Claimant "ROTH IRA"
account #█████5084 and
September 2005 Account Statement.

**EXHIBIT 11**
Current Quarterly, (Sept 2010), Account Statement for ROTH IRA account #█████5084

**EXHIBIT 12**
August 2005 Trade confirmation for 50,000 BCIT shares cusip 05968X106.in Claimant "TRAD IRA"
account #█████5083 and
September 2005 Account Statement.

**EXHIBIT 13**
Current Quarterly, (Sept 2010), Account Statement for TRAD IRA account #█████6083



## EXHIBIT LIST CONT.

**EXHIBIT 14**
August 31, 2005 temporary suspension.
http://www.sec.gov/litigation/suspensions/34-52363.pdf

**EXHIBIT 15**
Regulator response to BCIT situation and
May 4, 2009 Letter (page 2) from Stephen Luparello, Vice Chairman FINRA to
US Senator Jeff Merkley in response to Claimant inquiry.

**EXHIBIT 16**
November 3, 2009 SEC order revoking registration by default.
http://www.sec.gov/litigation/admin/2009/34-60920.pdf

**EXHIBIT 17**
The ABCs of the UCC.: Article 8: Investment Securities By Sandra M. Rocks, Carl S. Bjerre. ( One copy
of this book included for Arbitrator )

**EXHIBIT 18**
Paragraph from Article:
UCC Article 8: Will the indirect holding of securities survive the light of day?
by Russell A. Hakes Associate Professor of Law, Widener University School of Law.
http://llr.lls.edu/volumes/v35-issue3/hakes.pdf

**EXHIBIT 19**
pp 73-74 from:
The ABCs of the UCC.: General provisions By Frederick H. Miller, Amelia H. Boss

**EXHIBIT 20**
http://www.law.uc.edu/CCL/34ActRls/rule15c3-3.html
**Rule 15c3-3 -- Customer Protection--Reserves and Custody of Securities**
and
http://www.finra.org/web/groups/industry/@ip/@reg/@rules/documents/interpretationsfor/p037772.pdf
CUSTOMER PROTECTION -- RESERVES AND CUSTODY OF SECURITIES
SEA Rule 15c3-3

**EXHIBIT 21**
Scottrade brokerage account agreement, Page 3-4, Paragraphs 16-38
Account agreement available on line at Scottrade.com
http://www.scottrade.com/formscenter/PDF/111_BrokAccAgreement.pdf
http://www.scottrade.com/formscenter/PDF/RothIRA_Agreements.pdf
http://www.scottrade.com/formscenter/PDF/TraditionalIRA_Agreements.pdf

**Corporate Actions and Damages**
Name Change;
Reverse Stock Split;
Damages: cost to replace shares

In June 2008, two corporate actions occurred;
1.) Name changed to Energy Source Inc., and 2.) a 1 : 200 reverse stock split.
Both corporate actions are documented in filings with the Security and Exchange
Commission, however, neither action has been recognized or implemented by FINRA,
FINRA member brokerages, or the DTCC.  If proper records have been kept by the
brokerages, Customer account statements reflect pre-split BCIT shares with the original
cusip # 05968X106.  When pre-split BCIT shares with the cusip # 05968X106 are
presented to the transfer agent, (or directly to Energy Source Inc.), they will be replaced
with the appropriate number of new shares with a new cusip number.
In the case of BCIT,  200 cusip # 05968X106 (original shares) will be replaced with 1
(one) share of the new Energy Source Inc. shares with a new cusip number and the price
per share will increase and be adjusted proportionately.
(See SEC Energy Source Inc. corporate filings available online at:
http://sec.gov/cgi-bin/browse-edgar?action=getcompany&CIK=0001076779&owner=exclude&count=40)


Energy Source Inc. recognizes a price of $0.15 (fifteen cents per share) as the last price
the stock traded at on a public exchange before the reverse split, and confirmed on
December 19, 2010, that  $0.15  is the replacement value for my claim.

Respondent is able to procure new Energy Source Inc. shares for a price equivalent to the
pre-reverse split price of  $0.15 (fifteen cents) per share, by directly contacting Energy
Source Inc.

The 30,000 shares of cusip # 05968X106 in Claimant's  "ROTH IRA" account at $0.15
(fifteen cents) per share represent 150 new shares of Energy Source Inc. with a new cusip
number and a price of  $30.00 per share after the reverse split.
(30,000 x $0.15) = $ 4500.00 = (150 x $30.00)

The 50,000 shares of cusip # 05968X106 in Claimant's "TRAD IRA" account at $0.15
(fifteen cents) per share represent 250 new shares of Energy Source Inc. with a new cusip
number and a price of $30.00 per share after the reverse split.
(50,000 x $0.15) = $ 7500.00 = (250 x $30.00)

**Minimum cost to obtain genuine Energy Source Inc. shares:**

$ 4500.00 for "ROTH IRA" shares. (30,000 x $0.15 = $ 4500.00)
$ 7500.00 for "TRAD IRA" shares. (50,000 x $0.15 = $ 7500.00)

**TOTAL  $ 12,000.00**

**EXHIBIT 1**

Page 1 of 2

From:   Thomas Megas (tpm14@hotmail.com)
Sent:   Sun 12/19/10 1:34 AM
To:     jan kimball (jhk29@hotmail.com); thomas megas (tpm8@harolds.ch)

The last traded price was .15   and that is what the replacement value is. I confirm this as
CEO and President.

Thomas Megas

CEO & President

**EXHIBIT**

Page 2of 2

10

Scottrade
Compliance Department
12800 Corporate Hill Dr.
St. Louis, MO 63131

December 29, 2009

Re: Certificate request
    Energy Source, Inc. (BCIT)
    Scottrade Account #███5084
    Roth IRA  for Jan E. Harris-Kimball

To Whom It May Concern at Scottrade:

On August 18, 2005, I entered an online purchase order for 30,000 shares of true and legitimate equity in the security BCIT for my Scottrade Roth IRA account #███5084. Funds for that purchase were removed from my account and Scottrade sent me a confirmation that the trade was executed and the settlement date for that trade was August 23, 2005.  Although the SEC verified that some BCIT securities that traded in 2005 were counterfeit, Scottrade has repeatedly assured me that my shares of BCIT represent true and legitimate equity in BCIT.  On November 3, 2009, the SEC revoked BCIT's registration, consequently BCIT is no longer eligible for online trading.

I am demanding that Scottrade obtain and deliver to me, a physical Energy Source, Inc. Stock Certificate from Empire Stock Transfer representing those 30,000 shares of Energy Source, Inc.(BCIT) in my Roth IRA account.   The Transfer Agent for BCIT is Empire Stock Transfer, Inc., and the company, Energy Source, Inc., (BCIT)  fully supports shareholders holding their shares in certificate form.

EMPIRE STOCK TRANSFER INC.
1859 Whitney Mesa Dr.
Henderson, NV 89014
Phone:  (702) 818-5898
Fax:  (702) 974-1444
Email:  mjb@empirestock.com
Web:  www.empirestock.com

EXHIBIT 2

Page 1of 3

Recently, I contacted Matthew Blevins at Empire Stock Transfer, Inc. with questions pertaining to requesting a BCIT certificate, and on November 19, 2009 he wrote *"Your shares are at the broker. The process depends on their procedures. Eventually the request will be presented to us and we will cut the physical certificate, assuming the paperwork is in order, and return. You will have to ask your broker as to what their process is."*

If, for any reason, Scottrade's paperwork is not in order and Scottrade is unable to deliver to me a legitimate Stock Certificate representing my 30,000 shares of BCIT within the usual four to eight weeks it takes a brokerage to process a Stock Certificate request, then I am demanding that Scottrade deposit four thousand five hundred dollars, (30,000 x $0.15 = $4500.00), into my Roth IRA account in exchange for the 30,000 shares of BCIT that Scottrade cannot acquire a Certificate for.
( In October 2006, FINRA approved the resumption of BCIT's trading on the OTCBB, and on October 30, 2006, BCIT shares closed at $0.15 per share. No legitimate shares of BCIT have traded since that day due to the DTCC 'global lock'. )

I look forward to Scottrade's prompt attention to this matter.
Sincerely,


Jan E. Harris-Kimball
PO Box 1387
Philomath, Oregon 97370




cc.
Thomas Megas, CEO Energy Source, Inc.;
Kevin Anselm, Chief of Enforcement and Securities, Oregon DFCS.



EXHIBIT 2

Page 2of 3



MEMBER FINRA/SIPC

12800 Corporate Hill Drive
St Louis MO 63131-1834
314-965-1555 • 1-800-888-1980

January 13, 2010

Jan E. Harris-Kimball
3590 NW Dimple Hill Road
Corvallis, OR 97330-3295

Re: Scottrade Account 36E-XXXXX084

Dear Ms. Harris-Kimball:

I am writing in reference to the letter you sent dated December 29, 2009, which concerns a stock certificate request for the 30,000 shares of BCIT (Bancorp International Group) held in your Roth IRA referenced above. Specifically, you reference 30,000 shares of Energy Source Inc., which is presumably the exchange due to holders of BCIT. You also request, in the event that Scottrade cannot provide you a certificate for BCIT or Energy Source Inc., that your account be credited $4,500.00. I have researched your request and am reporting my findings below.

We received a notice from the Depository Trust & Clearing Corporation (DTCC), dated April 8, 2008, stating that BCIT status as non-transferrable. In addition the notice stated that when this status changes, certificates will be submitted to the exchange agent to be adjusted according to the terms of the exchange. Reportedly, the rate of exchange is: 1 new share of Energy Source, Inc. for each 200 of BCIT. On May 7, 2008, we received a DTCC notice that no further action is scheduled. Nothing more has been communicated by DTCC since then.

Based upon the above information, Scottrade cannot issue a physical stock certificate at this time. Until the transfer agent changes BCIT to Energy Source, Inc. with DTCC nothing can be done. We have no information of any date when this process will be completed. Since this situation is out of the control of Scottrade, your request for a monetary credit is also respectfully declined.

I hope this information is helpful. Thank you for your inquiry as we appreciate your business and value your concerns as a customer. If you need additional assistance, please feel free to contact your local branch at 503-391-5700 or toll free at 877-734-1980.

Sincerely,

Randy Copeland
Compliance Examiner

cc: Joel Zamudiobucio, Branch Manager

**EXHIBIT 2**
Page 3 of 3

13

From:   Thomas Megas (tpm14@hotmail.com)
Sent:   Tue 1/26/10 2:50 AM
To:     jhk29@hotmail.com; thomas megas (tpm8@harolds.ch); bill karaffa
(bkaraffa@sbcglobal.net)

Dear Jan,

I can offer you 30,000 shares of Energy Source Inc at $5 usd per share on behalf of a transfer
agent registered shareholder. Cash against phsysical delivery of the shares.

Best regards

Thomas Megas
Energy Source Inc.

**EXHIBIT 3**

Page 1of 1

14

Scottrade
General Counsel
12800 Corporate Hill Dr.
St. Louis, MO 63131

January 29, 2010

Re: Certificate request
    Energy Source, Inc. (BCIT)
    Scottrade Account #█████6084
    Roth IRA for Jan E. Harris-Kimball

To Scottrade General Counsel:

Recently the SEC revoked the registration of Energy Source Inc, (BCIT) shares due to
delinquent 10Q and 10K filings, causing BCIT shares to no longer be eligible for online
trading as they were when I purchased them through Scottrade.

Since they are ineligible for online trading, I prefer my Energy Source, Inc (BCIT) share
ownership to be represented on the official Energy Source shareholder list at Empire
Stock Transfer, Inc., under my name, Jan E. Harris-Kimball.

On December 29, 2009 I wrote Scottrade demanding a Certificate representing the 30,000
shares of Energy Source Inc.(BCIT) that reside in my Scottrade Roth IRA account .
I requested $4,500.00 (15 cents per share) be deposited in my account in exchange for
those shares if for any reason Scottrade was unable to provide a Certificate within the
usual four to eight weeks it takes a brokerage to process a Stock Certificate request.
I have since found that the replacement value for those share is much higher than 15 cents
per share.

**EXHIBIT 4**

Page 1of 4

15

Mr. Randy Copeland, a Scottrade Compliance Examiner, informed me in a letter dated January 13, 2010, that Scottrade refuses to issue me a physical Stock Certificate at this time and declines my request for monetary credit.

I do not believe Scottrade has the luxury of refusing my demand for Certificates. When Scottrade hangs out its shingle to do business in Oregon or Missouri or any other State, Scottrade is bound to abide by the Uniform Commercial Code.

Energy Source Inc, (BCIT) is a Nevada Corporation, thus I am entitled to a physical Stock Certificate for my 30,000 shares.   As I noted in my December 29, 2009 letter, both the Transfer Agent and the Company have indicated Certificates are available if the Brokerages paperwork is in order.

Article 8 of the Uniform Commercial Code effectively makes Scottrade a guarantor of any upper tier securities intermediary, thus Mr. Copeland is in error when he states this situation is out of the control of Scottrade. Scottrade's requirement to provide me a physical Stock Certificate is not dependent on the DTC's problems.

According to Oregon UCC Statutes ,you must comply with my demand.

*78.5070 Duty of securities intermediary to comply with entitlement order. (1) A securities intermediary shall comply with an entitlement order if the entitlement order is originated by the appropriate person, the securities intermediary has had reasonable opportunity to assure itself that the entitlement order is genuine and authorized and the securities intermediary has had reasonable opportunity to comply with the entitlement order.*

*78.5080 Duty of securities intermediary to change entitlement holder's position to other form of security holding. A securities intermediary shall act at the direction of an entitlement holder to change a security entitlement into another available form of holding for which the entitlement holder is eligible, or to cause the financial asset to be transferred to a securities account of the entitlement holder with another securities intermediary.*

**EXHIBIT 4**

Page 2of 4

16

After receiving Mr. Copeland's January 13, 2010 letter, I contacted Thomas Megas, CEO of Energy Source, Inc.; to inquire at what price genuine (pre split) shares were available in order to determine the replacement value for my 30,000 shares.

Mr Megas responded that he is able to provide 30,000 genuine shares of Energy Source, Inc for 5 US dollars per share. (I have enclosed his email to me)

If Scottrade is unable or unwilling to provide me with a genuine Certificate representing my 30,000 ( pre split) shares of Energy Source Inc. (BCIT), then I am demanding Scottrade deposit $150,000.00, a sum equal to the replacement value of $5 per share, into my account.

I look forward to working with Scottrade on resolving of this matter,

Jan E. Harris-Kimball
PO Box 1387
Philomath, Oregon 97370

cc.
Thomas Megas, CEO Energy Source, Inc.;
Kevin Anselm, Chief of Enforcement and Securities, Oregon DFCS.

enclosed:
December 29, 2009 letter to Scottrade
January 13, 2010 letter from Scottrade
January 26, 2010 email from Thomas Megas, CEO, Energy Source, Inc.



**EXHIBIT 4**

Page 3of 4



**17**

MEMBER FINRA/SIPC

12800 Corporate Hill Drive
St Louis MO 63131-1834
314-965-1555 ○ 1-800-888-1980

February 25, 2010

Jan E Harris-Kimball
3590 NW Dimple Hill Rd.
Corvallis, OR 97330-3295

RE: Scottrade Account #36E-XXXXX084

Dear Ms. Harris-Kimball:

This is in response to your letter received February 7, 2010. In your letter, you demanded that Scottrade provide you with a stock certificate for the 30,000 shares of Bancorp International Group (BCIT) held in your Roth IRA referenced above. You further demanded that Scottrade credit your account $150,000 as a replacement value of your BCIT shares if Scottrade is unable or unwilling to provide a BCIT certificate for the shares you hold in your account.

We have reviewed this matter and concluded that it is impossible at the present time to provide you with the certificate you request. It is impossible to provide you a certificate because on August 16, 2005, the Depository Trust & Clearing Corp. (DTCC) placed a "global lock" on BCIT. A global lock means shares are not eligible for delivery, transfer, or withdrawal.  See enclosure (1). Scottrade has confirmed with DTCC that the global lock is still in effect as of the date of this letter. As you may know, BCIT was subject of litigation by the U.S. Securities and Exchange Commission because its shares had been counterfeited. We have provided the SEC's Litigation Notice and a Notice for Scottrade's primary regulator explaining the issues with BCIT. See enclosures (2) and (3).

The global lock prevents BCIT shares from being certificated as you demand. We have contacted Empire Stock Transfer Inc., BCIT's transfer agent, and it has confirmed that due to the DTCC global lock it will not issue a certificate for shares of BCIT.

In June 2008, BCIT announced a 1- for -200 reverse split and name change from Bancorp International Group to Energy Source Inc. (see enclosure 4). This corporate action was never made effective. As such, BCIT shares have not been converted to Energy Source shares at this time.

As we stated above, it is impossible at this time for Scottrade or any other broker to meet your demands to have BCIT shares certificated. We understand that you are frustrated with the BCIT situation. However, Scottrade will not credit your account as demanded. As explained, this situation is outside of Scottrade's control and it is impossible for the transfer of BCIT shares to take place until the global lock is lifted.

Sincerely,

Matthew Raye
Senior Compliance Examiner

cc: Joel Zamudiobucio, Branch Manager

Enclosures (4)



**EXHIBIT 4**

Page 4of 4



From:    Thomas Megas (tpm14@hotmail.com)
Sent:    Tue 5/25/10 5:05 PM
To:      jan kimball (jhk29@hotmail.com)

the brokers can get as many shares as they need. They simply have to ask the company directly for them and pay for them. They cannot get shares from the dtc or anybody else because dtc in reality has none since the most of the paper they hold are simply based on electronic entries and not backed by real paper. Both the brokers and the dtc have committed fraud.

best regards

thomas megas

From: jhk29@hotmail.com
To: tpm14@hotmail.com
Subject: BCIT....Is it possible
Date: Tue, 25 May 2010 07:55:07 -1000

Dear Mr. Megas,

I realize you are very busy and BCIT is not at the top of your priorities, but
I must turn to you, for certain 'facts' in pursuing my claims against my brokerages.
(I sent you an email in late April, asking about the BCIT share structure as Empire Stock Transfer would not give me current information.  either my email did not reach you or you chose not to reply)
This time, I only have one question, and hope you will reply to it.
Is it possible for brokerages to meet my demand to have my BCIT shares certificated at this time?

Here is why I am asking:
I do not understand how the increase in Authorized shares or the December 2005 settlement or any other Corporate actions affected the Brokerages ability to obtain what they need to satisfy their Obligations to Account holders like myself who have BCIT Entitlements.

In my pre-arbitration letter to Scottrade, I want to include the fact, (if it is true), that it is indeed possible at this time for brokers, including Scottrade to meet my demand to have BCIT shares certificated.
(I know the brokerages are trying to use the DTCC/DTC 'global lock' as justification for non-performance, but.... if there was no 'global lock', and the brokerage were forced, is it possible for them to meet my demand.  My demand is to exit the indirect holding system and be directly registered on the BCIT company register, a certificate is only a representation of being directly registered)

Scottrade wrote to me, in a letter dated February 25, 2010, that it is "impossible":

*"It is impossible at the present time to provide you with the certificate you request, It is impossible to provide you a certificate because on August 16, 2005 the Depository Trust & Clearing Corp (DTCC) placed a "global lock" on BCIT"*

and later they reiterated their "impossible" claim to include all brokers.

*"it is impossible at this time for Scottrade or any other broker to meet your demands to have BCIT shares certificated."*

thanks,
Jan E. Harris-Kimball



**EXHIBIT 5**

Page 1of 1

Rodger Riney, President and CEO
Scottrade
12800 Corporate Hill Dr.
St. Louis, MO 63131

June 6, 2010

Re: Certificate request

Dear Mr. Riney:

Scottrade has built its reputation as an honest, ethical brokerage, earning that reputation by acting with integrity. I have a problem with the way Scottrade is handling my recent 'entitlement order' to exit the indirect holding system and be directly registered on an issuers books. It is my hope that Scottrade will take a reasoned approach in determining how to satisfy its obligation to me.



EXHIBIT 6

Page 1 of 7

*20*

On December 29, 2009, I contacted Scottrade Compliance and requested a certificate representing the 30,000 shares of BCIT in my ROTH IRA account, exercising my right as an entitlement holder to exit the 'indirect holding system'. The Compliance Department denied my request, citing that a DTCC/DTC 'global lock' prevented them from meeting my demand.

If Compliance had delved deeper into this situation, they would have found that the BCIT security entitlements Scottrade created in my IRA accounts were created while the DTCC/DTC 'global lock' was in effect. Until November 3, 2009, the business decision to allow trading of BCIT was at the discretion of individual brokerages, not the DTCC/DTC. The DTCC/DTC 'global lock' on BCIT is an irrelevant topic and has nothing to do with Scottrade's obligations to me.

The rights of entitlement holders and the obligations of securities intermediaries are set out clearly in Article 8 of the UCC. As you know, a security entitlement is not a property interest in any specific financial asset held by a securities intermediary or by the clearing corporation but instead consists of personal rights against the securities intermediary and its property.

Establishing my BCIT security entitlements while a DTCC/DTC 'global lock' was in effect, yet disclaiming one of the basic rights of those entitlements because of that 'global lock' is not consistent with the obligation of good faith performance nor fair dealing. The right I am referring to is the right of an entitlement holder to exit the 'indirect holding system' and be directly registered on the issuers books.

The DTCC 'global lock' may be outside of Scottrade's control, but contrary to the Compliance Departments conclusion, Scottrade's obligations to me are absolutely within Scottrade's control.

**EXHIBIT 6**

Page 2 of 7

The DTCC/DTC has a global lock on BCIT securities because the Cede & Co. certificate inventory was compromised by counterfeit BCIT certificates. That 'global lock' became effective August 11, 2005 and continues today.

The DTC/DTCC 'global lock' will be in effect until brokerages replace counterfeit BCIT with legitimate BCIT. According to the SEC investigation, the 'book entries' for BCIT that brokerages created prior to September 2005 may represent "failed to be delivered" BCIT cusip #05968X106. Only when brokerages present their paperwork to the transfer agent will they know if they have legitimate BCIT cusip #05968X106 to satisfy their obligations to entitlement holders. In the February 25, 2010 Scottrade Compliance letter to me, Scottrade implied that it was unable to present to BCIT's transfer agent, Empire Stock Transfer, Inc., paperwork representing legitimate BCIT. According to the Securities and Exchange Commission, the only way to cure this is to initiate a buy-in, and "the only entity authorized by the rules to require a buy-in is the receiving member."

Due to my request to be directly registered on the issuers books, Scottrade must now obtain the genuine financial asset represented by my BCIT security entitlements. Because "the only entity authorized by the rules to require a buy-in is the receiving member", Scottrade must either initiate a buy-in to force the seller to provide legitimate BCIT or Scottrade can obtain shares directly from Energy Source Inc., (BCIT).

I confirmed that it is indeed possible for all brokers, including Scottrade to obtain shares of BCIT from Energy Source, Inc. On May 25, 2010, I emailed the CEO of Energy Source, Inc., Mr. Thomas Megas and asked whether shares were available for brokers, such as Scottrade who needed them to satisfy their obligations to entitlement holders like myself. His reply:

*"the brokers can get as many shares as they need. They simply have to ask the company directly for them and pay for them. "*



**EXHIBIT 6**

Page 3 of 7

22

My initial request on December 29, 2009 was for a certificate representing the 30,000 shares of BCIT in my ROTH IRA account.  Today, in this letter,  I am requesting that Scottrade also provide me a certificate representing the 50,000 shares of BCIT in my Traditional IRA account.

One of the rights of an entitlement holder is the right to exit the indirect holding system, and be directly registered on the issuers books as the owner of the relevant securities. If Scottrade chooses to default in performance of it's duty and obligation to change the form of my BCIT holdings, then the appropriate remedy is for  Scottrade to credit my accounts a sum equal to what I will pay to replace those shares .

I was able to obtain a quote for the per share cost to replace my 30,000 shares of BCIT (cusip #05968X106) within 2 days by emailing the CEO Mr. Thomas Megas in January 2010.
Mr. Thomas Megas's, reply to me on January 26, 2010

*Dear Jan,*
*I can offer you 30,000 shares of Energy Source Inc at $5 usd per share on behalf of a transfer agent registered shareholder. Cash against phsysical delivery of the shares.*
*Best regards*
*Thomas Megas*
*Energy Source Inc.*

The delivery of stock certificates typically takes four to eight weeks.
If Scottrade will not obtain genuine BCIT certificates for me within a reasonable eight weeks, then Scottrade can satisfy its obligation by purchasing my security entitlements from me at an agreed upon price.  I will then have the option of purchasing shares directly from Energy Source, Inc. to replace those in my IRA accounts.



**EXHIBIT 6**

Page 4 of 7

I purchased the rights to BCIT shares in 2005, and since that time Scottrade has had the obligation to provide them to me when I demand.  I had hoped the regulators and FINRA members would sort out the problem and Scottrade would again allow trading in BCIT. That did not happen, and on November 3, 2009,  the Securities and Exchange Commission revoked the registration of BCIT, which makes it ineligible for trading on a public exchange. The SEC action on November 3, 2009 has no influence on Scottrade's ability to provide me a certificate because even revoked stocks are eligible to be certificated.  I recently requested a stock certificate for another stock that was revoked by the SEC and  I received that certificate in less than three weeks after I requested it.

There is no longer a reason for me to hold my BCIT shares in the indirect form at Scottrade, and I prefer to have them directly registered on the issuer's books. I intend to follow through until we reach a resolution based on my rights and Scottrade's legal obligations, and I expect to be treated fairly and honestly by Scottrade.
How does Scottrade intend to remedy this situation if it chooses to default on its legal obligation to provide me with the BCIT certificates as I have requested?  So far, the Compliance Department has been unwilling to address this question, I hope your personal attention to this matter will make a difference.


Sincerely,

Jan E. Harris-Kimball
PO Box 1387
Philomath, Oregon  97370


cc Mr. Thomas Megas,
CEO Energy Source Inc.
tpm14@hotmail.com

**EXHIBIT 6**

Page 5 of 7

24

BCIT was hijacked sometime in March/April 2005. FINRA and the SEC were aware of the crime in progress as early as June 22, 2005. On August 31, 2005 the SEC suspended trading for 10 days and then on November 3, 2009 the SEC revoked the registration of BCIT and it is no longer eligible to be traded on a public exchange. BCIT was named Bancorp International Group, Inc. in 2005 and has since changed it's name to Energy Source Inc. Thomas Megas is the CEO and the person to contact with questions about shares/certificates. **Thomas Megas can be reached at tpm14@hotmail.com**

On **August 16, 2005,** the DTCC/DTC notified "all participants" of it's 'global lock' on BCIT securities, (Bancorp International Group, Inc., cusip #05968X106), effective August 11, 2005. Scottrade is a DTCC/DTC participant, but the DTCC/DTC 'global lock' did not prevent Scottrade from creating BCIT securities entitlements in my IRA accounts.

On **August 18, 2005,** I directed Scottrade to purchase 30,000 shares of BCIT, (then Bancorp International Group Inc., now Energy Source, Inc.), in my ROTH IRA account. Scottrade removed funds from my account and created security entitlements for 30,000 shares of BCIT cusip #05968X106. I was sent confirmation that my purchase cleared and settled on August 23, 2005.

On **August 29, 2005** I directed Scottrade to purchase 50,000 shares of BCIT in my Traditional IRA account. Scottrade removed funds from my account and created security entitlements for 50,000 shares of BCIT cusip #05968X106. I was sent confirmation that my purchase cleared and settled on September 1, 2005.

On **August 31, 2005,** the Securities and Exchange Commission suspended trading of BCIT until September 15, 2005.

On **November 3, 2009,** the Securities and Exchange Commission revoked the registration of BCIT.



**EXHIBIT 6**

Page 6of 7

**25**

*Scottrade®*

MEMBER FINRA/SIPC

July 9, 2010

Ms. Jan E Harris-Kimball
3590 NW Dimple Hill Rd
Corvallis, OR  97330-3295

Re:  Scottrade Account 36E- XXXXX084

Dear Ms. Harris-Kimball,

I am writing in response to your letter dated June 6, 2010 regarding certificates or remuneration for your shares of Bancorp International Group (BCIT).  I have reviewed your letter with Scottrade's President, Mr. Rodger Riney, and I am responding accordingly.

Please accept our apologies for the redundant answer you are receiving with respect to your inquiries regarding shares of BCIT.  We understand your frustration regarding this situation.

Until the global lock on BCIT is removed at the Depository Trust & Clearing Corporation (DTCC), Scottrade will not be in a position to obtain a certificate in your name, nor provide you remuneration for the shares of BCIT as you have requested.

We do have your positions in BCIT properly documented and when this matter is resolved Scottrade will act accordingly.

Sincerely,

Kevin E. Gaylord
Compliance Examiner

cc:  Joel Zamudiobucio, Branch Manager
     Rodger Riney, President and CEO

**EXHIBIT 6**

Page 7 of 7

Scottrade Compliance
12800 Corporate Hill Dr.
St. Louis, MO 63131

Re: Energy Source Inc. (BCIT)                    October 9, 2010

Dear Scottrade Compliance,

I received your July 9, 2010 letter in which you assured me that my BCIT positions are properly documented, however, Scottrade's refusal to directly register my shares indicates my funds may have been misappropriated or otherwise used in ways that are inconsistent with my expectations.

In light of the Bernie Madoff scandal and the recent fraud charges levied against Stanford Financial Group, it is imperative that Scottrade provide me with written third party independent verification that:

1.) Scottrade has properly documented my BCIT positions in my four accounts at Scottrade and,

2.) The assets underlying all my BCIT security entitlements, cusip # 05968X106, are safeguarded at a custodian, and have been physically inspected, counted and verified true and legitimate.

*"Because of technology, someone can make account statements look real," says Grace Vogel, Finra's executive vice president of member regulation. Finra is mainly concerned about potential investor fraud, Vogel said. "Obviously, if the assets don't exist at the custodian, a fraud has been uncovered."*

I presume Scottrade will welcome the opportunity to provide me with the verification I am requesting, and I look forward to receiving it in a timely manner.

Sincerely,

Jan E. Harris-Kimball
PO Box 1387
Philomath, Oregon 97370

**EXHIBIT 7**

Page 1of 2



MEMBER FINRA/SIPC

October 29, 2010

Ms. Jan E Harris-Kimball
PO Box 1387
Philomath, OR  97370-1387

Re:  Scottrade Account 36E-XXXXX083; XXXXX084; XXXXX086; XXXXX357

Dear Ms. Harris-Kimball,

I am writing in response to your letter dated October 9, 2010 requesting that an independent third party
verify that Scottrade has properly documented the Bancorp International Group (BCIT) positions in your
four referenced accounts.  Further you request that this third party ensure that your BCIT positions are
identified by cusip 05968X106, safeguarded at a custodian, and have been physically inspected and are
true and legitimate.

Please accept my apologies, Scottrade does not provide independent third party verification of account
positions.  Scottrade does provide customers with account statements, which are official documents
representing the activity and positions in a customer's account.

I have enclosed the September account statements for the four referenced accounts.  Please note that the
BCIT positions on the account statements correspond to numbers you provided in your letter.  Further,
Scottrade's Security Database does reflect that the BCIT in your account is represented by cusip
05968X106.

I have also reviewed the mailing address on all 4 accounts and I can confirm that the mailing address for
all accounts is PO Box 1387, Philomath, OR  97370-1387.

Please be assured Scottrade does have your positions in BCIT properly documented and when this matter
is resolved Scottrade will act accordingly.

Sincerely,

Kevin E. Gaylord
Compliance Examiner

cc:  Joel Zamudiobucio, Branch Manager

enclosures

**EXHIBIT 7**

Page 2of 2

Scottrade Compliance Department
500 Maryville Center Drive,
St. Louis, Missouri 63141-5814

November 8, 2010

Re: Notice of Intention to Arbitrate

Dear Scottrade Compliance,

I am writing to you because I intend to file an arbitration claim with FINRA regarding Scottrade's refusal to directly register the Energy Source Inc. (BCIT) shares I am entitled to in my ROTH IRA account #██████6084 and my Traditional IRA account #██████6083.

I will be requesting replacement value for the shares of Energy Source Inc.(BCIT) I am entitled to in my IRA accounts. Although Energy Source Inc. shares no longer trade on a public exchange, replacement value can be established with reasonable certainty.
I obtained a quote for genuine transfer agent registered shares on January 26, 2010, and Scottrade can obtain shares directly from Energy Source Inc. by contacting the CEO, Mr. Thomas Megas.

If Scottrade fails to directly register my shares within 30 days from the receipt of this letter or fails to initiate settlement negotiations with me based on replacement value, I will file my claim with FINRA to obtain a judgment.

Sincerely,

Jan E. Harris-Kimball
PO Box 1387
Philomath, Oregon 97370

cc  Thomas Megas, CEO Energy Source, Inc. tpm14@hotmail.com

**EXHIBIT 8**

Page 1 of 2



29

MEMBER FINRA/SIPC

November 23, 2010

Ms. Jan E Harris-Kimball
PO Box 1387
Philomath, OR  97370-1387

Re:  Scottrade Account 36E-XXXXX083; XXXXX084; XXXXX086; XXXXX357

Dear Ms. Harris-Kimball,

I am writing in reference to your letter dated November 8, 2010 regarding your ability to trade Energy Source Inc., formerly known as Bancorp International Group (BCIT).

After reviewing BCIT in Scottrade's Security Master database, I can confirm that it remains on a global lock at the Depository Trust and Clearing Corporation (DTCC).  Until the global lock is lifted at DTCC, Scottrade will be unable to trade or process your request for replacement value on your shares of BCIT.

Scottrade understands your frustration concerning the status of BCIT, and appreciates your patience while the DTCC global lock is in effect.  If you would need additional assistance with your account please contact your local branch at 804-672-2000 or toll-free at 800-664-1995.

Sincerely,

Kevin E. Gaylord
Compliance Examiner

cc:  David Hamilton, Branch Manager

EXHIBIT 8

Page 2of 2

30

# The Depository Trust Company
# IMPORTANT

**B#:**            8418

**DATE:**          August 16, 2005

**TO:**            All Participants, Depository Facilities, and Pledgee Banks

**CATEGORY:**      Operations

**FROM:**          Michael Tulaney, Vice President

**ATTENTION:**     Managing Partners, Officers, and Cashiers

**SUBJECT:**       Special Alert Regarding Bancorp International Group, Inc.

Be advised that effective August 11, 2005, DTC has suspended all services, except Custody services, for the below referenced issue.

| **CUSIP** | **SECURITY NAME** |
|-----------|-------------------|
| 05968X106 | Bancorp International Group Inc. |

Please see the attached press releases from the company providing notice, among other things, that "individuals and corporate entities involved with the illegal takeover of the company printed invalid share certificates".

DTC participants are, therefore, strongly urged to take whatever precautions are necessary in order to protect themselves and their customers in light of this continuing problem and to notify correspondent firms and other parties that may be affected by this problem.

Questions regarding this notice should be directed to the company, or DTC's Nick Cerchio at (212) 855-5006.



**EXHIBIT 9**

Page 1 of 1

11/13/2010                                        ConfirmationDetailsPrint                                        **31**

SCOTTRADE INC CUST FBO
JAN E HARRIS-KIMBALL ROTH IRA
PO BOX 1387
PHILOMATH OR 97370-1387

*Scottrade*

| Symbol | | | Account # | Trade # | AT* | Cap* | AI* | Trade Date | Settlement Date |
|--------|--|--|-----------|---------|-----|------|-----|-----------|-----------------|
| BCIT | | | ▮6084 | 0230FQGX | 1 | 1 | 4 | 8/18/2005 | 8/23/2005 |
| You | Quantity | CUSIP Number | Security Description | | | | | Coupon | Office |
| BOUGHT | 30000 | 05968X106 | BANCORP INTL GROUP | | | | | % | 36E |

| Price | Principal | Commission | State Tax | Misc. Fee* | Trans Fee | Misc | Interest | Net Amount |
|-------|-----------|------------|-----------|------------|-----------|------|----------|------------|
| 0.0091 | 273.00 | 8.37 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 281.37 |

ADDITIONAL INFORMATION:

UNSOLICITED ORDER

IN ACCORDANCE WITH YOUR INSTRUCTIONS WE ARE CONFIRMING THE ABOVE UNSOLICITED TRANSACTION(S) FOR YOUR ACCOUNT, SUBJECT TO TERMS LISTED BELOW. PLEASE RETAIN THIS CONFIRMATION FOR TAX PURPOSES. NOTIFY SCOTTRADE IMMEDIATELY IF ANY INFORMATION CONTAINED IN THIS CONFIRMATION IS NOT CORRECT. THE AGREEMENT CONTROLLING THIS TRANSACTION AND THE EXPLANATION OF THE SYMBOLS ARE PRINTED BELOW.

**AGREEMENT**

It is agreed between Scottrade, Inc. ("Scottrade") and the Customer that:

1. All transactions are subject to the rules and regulations of the US Securities and Exchange Commission, the Federal Reserve Board, the Financial Industry Regulatory Authority, or any Market Center, Clearing Agency, or regulatory authority that may have jurisdiction over this transaction.
2. All securities carried in a margin account may at any time be hypothecated and commingled with securities carried for the account of other customers and loaned or pledged by Scottrade for a sum not to exceed 140% of the aggregate indebtedness of that margin account.
3. The Customer agrees to deliver securities sold and payment for securities bought to Scottrade no later than the settlement date. Otherwise, the securities may be bought in or sold out at the discretion of Scottrade. Failure to meet settlement may also result in the cancellation of this transaction or additional charges added to the account. Customer agrees to accept any liability resulting from any failure to complete the transaction. Pending full payment on purchase, securities may be hypothecated and commingled with other securities so purchased until payment is received.
4. On purchases the name of the seller, and on sales the name of the purchaser, date and time of transaction, as well as any additional remuneration received by Scottrade in connection with this transaction, will be provided upon request.
5. Should it become apparent that a dividend claim will be forthcoming after the settlement of this transaction, Scottrade reserves the right to withhold the claim amount from any proceeds or amount due.

**EXPLANATION OF CODED SYMBOLS**

AT* – Account Type
  0. Broker Dealer
  1. Cash
  2. General Margin
  3. Short
  4. Special Subscription

CAP* – Capacity in which the firm acted
  1. As Agent for you we have sold or bought this security.
  2. As Principal we have sold to you or bought from you this security.
  3. As Agent for another we have sold to you or bought from you this security.
  4. As Agent for both buyer and seller.
  5. As Principal with agency commission charged.

AI* – Account Instructions
  BUYS
  1. Transfer and mail security to customer
  2. Hold security
  3. Safekeep security in customer name
  4. Safekeep security in street name
  5. Special written instructions
  SELLS
  J. Hold funds in account
  K. Mail check to customer on receipt of security
  L. Apply proceeds to purchase
  M. Special written instructions

Misc. Fee* – The Misc. Fee is levied to recover costs associated with fees assessed to the firm by self regulatory organizations. The Misc. Fee is calculated as a percentage of sale proceeds, and fractional amounts may be rounded up or down to the next cent.

Trans Fee* – Mutual Fund Transaction Fees

Misc* – Miscellaneous charges
  Certificate Fees
  Postage and Handling
  Other

**EXHIBIT 10**

Page 1of 2

0 - 1/2: 0



**Scottrade**

12855 Flushing Meadow P.O. Box 31759
St. Louis, MO 63131-0759 - 314-965-1555

| Branch Office |
|---|
| SCOTTRADE INC |
| 2411 LANCASTER DR NE |
| SALEM OR 97305 |
| |
| (503) 363-6138 |

| Account Number | Page Number |
|---|---|
| ____6084 | 1 |
| **Period Ending** | **Prior Statement** |
| August 31, 2005 | July 29, 2005 |
| | **Office** |
| | 36E |

SCOTTRADE INC TR FBO
JAN E HARRIS-KIMBALL ROTH IRA
3590 NW DIMPLE HILL RD
CORVALLIS OR  97330-3295

Ildalaadallaallullaaallaallllaldlalalaullaallaal

### Information Update

Be sure to explore our new trading Web site at www.scottrade.com for new and improved features
with the same low commissions.

## ACCOUNT SUMMARY

| | VALUE THIS PERIOD |
|---|---|
| VALUE SECURITIES IN POSITION | 1,700.00 |
| ACCOUNT MONEY BALANCES | 22.27 |
| **ACCOUNT TOTAL VALUE** | **1,722.27** |

## TRANSACTION SUMMARY

| | |
|---|---|
| OPENING BALANCE | 303.54 |
| CREDITS: | |
| OTHER CREDITS | 0.10 |
| TOTAL CREDITS | 0.10 |
| DEBITS: | |
| OTHER DEBITS | - 281.37 |
| TOTAL DEBITS | - 281.37 |
| CLOSING BALANCE | 22.27 |

## SECURITY POSITIONS

| Type | Symbol /<br>Cusip | Quantity | Description | Estimated Market | | | Estimated Annual | |
|---|---|---|---|---|---|---|---|---|
| | | | | Price | Value | % | Income | Cur.Yld. |
| CASH | BCIT | 30,000 | BANCORP INTL GROUP<br>NO BUYS/NO SELLS | 0.020 | 600.00 | 35.29 | | |
| CASH | MAMG | 1 | MEDIA MAGIC | 0.000 | * | 0.00 | | |
| CASH | SHRN | 20,000 | SHELRON GROUP | 0.055 | 1,100.00 | 64.71 | | |
| | | | TOTAL | | 1,700.00 | | | |

## ACCOUNT ACTIVITY

**CASH ACCOUNT**

| Date | Transaction | Quantity | Description | Price | Amount | Balance |
|---|---|---|---|---|---|---|
| | | | OPENING BALANCE | | | 303.54 |
| 08/23/05 | BOUGHT | 30,000 | BANCORP INTL GROUP<br>UNSOLICITED ORDER   BCIT | .0091 | - 281.37 | 22.17 |
| 08/23/05 | IRA INTRL TRNSFR<br>IN | 500,000 | GLUV ORDINARY<br>ADJ POS      GV | | 0.00 | 22.17 |
| 08/23/05 | IRA INTRL TRNSFR<br>OUT | 1 | MEDIA MAGIC<br>MAMG | | 0.00 | 22.17 |
| 08/24/05 | IRA INTRL TRNSFR<br>IN | 500,000 | GLUV ORDINARY<br>GV | | 0.00 | 22.17 |
| 08/24/05 | IRA INTRL TRNSFR<br>IN | 500,000 | GLUV ORDINARY<br>GV | | 0.00 | 22.17 |

**EXHIBIT 10**

Page 2 of 2

Page: 1



SCOTTRADE INC CUST FBO
JAN E HARRIS-KIMBALL ROTHIRA
PO BOX 1387
PHILOMATH OR 97370-1387

**Branch Office**

SCOTTRADE INC
4841 COMMERCIAL ST SE
SALEM OR 97302

(503) 391-5700

| Account Number | Office |
|---|---|
| ████004 | 38E |

| Period Beginning | Period Ending |
|---|---|
| 09 / 01 / 2010 | 09 / 30 / 2010 |

## INFORMATION UPDATE

With the updated Scottrade Mobile, you can manage your account and research the market from almost anywhere using your mobile device. Check out our fresh new look and advanced features by visiting www.scottrade.com/mobile

## ACCOUNT SUMMARY

| | VALUE THIS PERIOD |
|---|---|
| VALUE SECURITIES IN POSITION | 47.23 |
| MONEY BALANCES : | |
| BANK DEPOSIT PROGRAM BALANCE | 1,042.68 |
| OKERAGE ACCOUNT BALANCE | 0.00 |
| MONEY BALANCE | 1,042.68 |
| L ACCOUNT VALUE | 1,089.91 |

## ACTIVITY SUMMARY

| | |
|---|---|
| OPENING TOTAL MONEY BALANCE | 1,042.65 |
| CREDITS: | |
| DIVIDEND/INTEREST INCOME | 0.03 |
| OTHER CREDITS | 0.00 |
| TOTAL CREDITS | 0.03 |
| DEBITS: | |
| DIVIDEND/INCOME EXPENSE | 0.00 |
| OTHER DEBITS | 0.00 |
| TOTAL DEBITS | 0.00 |
| CLOSING TOTAL MONEY BALANCE | 1,042.68 |

## SECURITY POSITIONS

| Symbol / Cusip | Quantity | Description | Estimated Market | | | | Estimated Annual | |
|---|---|---|---|---|---|---|---|---|
| | | | Price | Value | % | Income | Cur. Yld |
| CASH | AWR# | 0 | ALL WORLD RESOURCES | 0.00 | 0.00 | 0.00 | 0.00 | |
| CASH | (BCT) | 30,000 | BANCORP INTL GROUP *NO BUY/NO SELL | 0.00 | 0.00 | 0.00 | 0.00 | |
| CASH | GNMED# | 10,000 | GENOMED INC *NOT TRADING AS OF 040910 | 0.00 | 0.00 | 0.00 | 0.00 | |

EXHIBIT A

Page 1of 1

11/13/2010                        ConfirmationDetailsPrint

SCOTTRADE INC CUST FBO
JAN E HARRIS-KIMBALL IRA
PO BOX 1387
PHILOMATH OR 97370-1387

| Symbol | | | Account # | Trade # | AT* | Cap* | AI* | Trade Date | Settlement Date |
|--------|--|--|-----------|---------|-----|------|-----|------------|-----------------|
| BCIT | | | 6083 | 0241B23F | 1 | 1 | 4 | 8/29/2005 | 9/1/2005 |
| You | Quantity | CUSIP Number | Security Description | | | | | Coupon | Office |
| BOUGHT | 50000 | 05968X106 | BANCORP INTL GROUP | | | | | % | 36E |

| Price | Principal | Commission | State Tax | Misc. Fee* | Trans Fee | Misc | Interest | Net Amount |
|-------|-----------|------------|-----------|------------|-----------|------|----------|------------|
| 0.05 | 2,500.00 | 19.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2,519.50 |

ADDITIONAL INFORMATION:

UNSOLICITED ORDER

IN ACCORDANCE WITH YOUR INSTRUCTIONS WE ARE CONFIRMING THE ABOVE UNSOLICITED TRANSACTION(S) FOR YOUR ACCOUNT, SUBJECT TO TERMS LISTED BELOW. PLEASE RETAIN THIS CONFIRMATION FOR TAX PURPOSES. NOTIFY SCOTTRADE IMMEDIATELY IF ANY INFORMATION CONTAINED IN THIS CONFIRMATION IS NOT CORRECT. THE AGREEMENT CONTROLLING THIS TRANSACTION AND THE EXPLANATION OF THE SYMBOLS ARE PRINTED BELOW.

### AGREEMENT

It is agreed between Scottrade, Inc. ("Scottrade")and the Customer that:

1. All transactions are subject to the rules and regulations of the US Securities and Exchange Commission, the Federal Reserve Board, the Financial Industry Regulatory Authority, or any Market Center, Clearing Agency, or regulatory authority that may have jurisdiction over this transaction.
2. All securities carried in a margin account may at any time be hypothecated and commingled with securities carried for the account of other customers and loaned or pledged by Scottrade for a sum not to exceed 140% of the aggregate indebtedness of that margin account.
3. The Customer agrees to deliver securities sold and payment for securities bought to Scottrade no later than the settlement date. Otherwise, the securities may be bought in or sold out at the discretion of Scottrade. Failure to meet settlement may also result in the cancellation of this transaction or additional charges added to the account. Customer agrees to accept any liability resulting from any failure to complete the transaction. Pending full payment on purchase, securities may be hypothecated and commingled with other securities so purchased until payment is received.
4. On purchases the name of the seller, and on sales the name of the purchaser, date and time of transaction, as well as any additional remuneration received by Scottrade in connection with this transaction, will be provided upon request.
5. Should it become apparent that a dividend claim will be forthcoming after the settlement of this transaction, Scottrade reserves the right to withhold the claim amount from any proceeds or amount due.

### EXPLANATION OF CODED SYMBOLS

AT* – Account Type
 0. Broker Dealer
 1. Cash
 2. General Margin
 3. Short
 4. Special Subscription

CAP* – Capacity in which the firm acted
 1. As Agent for you we have sold or bought this security.
 2. As Principal we have sold to you or bought from you this security.
 3. As Agent for another we have sold to you or bought from you this security.
 4. As Agent for both buyer and seller.
 5. As Principal with agency commission charged.

AI* – Account Instructions
 BUYS
 1. Transfer and mail security to customer
 2. Hold security
 3. Safekeep security in customer name
 4. Safekeep security in street name
 5. Special written instructions
 SELLS
 J. Hold funds in account
 K. Mail check to customer on receipt of security
 L. Apply proceeds to purchase
 M. Special written instructions

Misc. Fee* – The Misc. Fee is levied to recover costs associated with fees assessed to the firm by self regulatory organizations. The Misc. Fee is calculated as a percentage of sale proceeds, and fractional amounts may be rounded up or down to the next cent.

Trans Fee* – Mutual Fund Transaction Fees

Misc* – Miscellaneous charges
 Certificate Fees
 Postage and Handling
 Other

EXHIBIT 12

Page 1of 2



## Scottrade

12855 Flushing Meadow P.O. Box 31759
St. Louis, MO 63131-0759 – 314-965-1555

0 - 1/1: 0

| Branch Office |
|---|
| SCOTTRADE INC |
| 2411 LANCASTER DR NE |
| SALEM OR 97305 |
| |
| (503) 363-6138 |

| Account Number | Page Number |
|---|---|
| 5083 | 1 |
| **Period Ending** | **Prior Statement** |
| September 30, 2005 | August 31, 2005 |
| | **Office** |
| | 36E |

SCOTTRADE INC TR FBO
JAN E HARRIS-KIMBALL IRA
3590 NW DIMPLE HILL RD
CORVALLIS OR  97330-3295

### Information Update

**Based on customer feedback, upgrades and enhancements to our new trading Web site continue to roll out weekly; be sure to check back often!**

### ACCOUNT SUMMARY

| | VALUE THIS PERIOD |
|---|---|
| VALUE SECURITIES IN POSITION | 6,815.00 |
| ACCOUNT MONEY BALANCES | 273.02 |
| ACCOUNT TOTAL VALUE | 7,088.02 |

### TRANSACTION SUMMARY

| | |
|---|---|
| OPENING BALANCE | 2,791.28 |
| CREDITS: | |
| OTHER CREDITS | 1.24 |
| TOTAL CREDITS | 1.24 |
| DEBITS: | |
| OTHER DEBITS | - 2,519.50 |
| TOTAL DEBITS | - 2,519.50 |
| CLOSING BALANCE | 273.02 |

### SECURITY POSITIONS

| Type | Symbol / Cusip | Quantity | Description | Estimated Market Price | Value | % | Estimated Annual Income | Cur.Yld. |
|---|---|---|---|---|---|---|---|---|
| CASH | ABEW | 2,000 | AIRBEE WIRELESS | 0.600 | 1,200.00 | 17.61 | | |
| CASH | BCIT | 50,000 | BANCORP INTL GROUP NO BUYS/NO SELLS | 0.010 | 500.00 | 7.34 | | |
| CASH | PHFB | 1,000 | PHANTOM FIBER | 0.600 | 600.00 | 8.80 | | |
| CASH | SHRN | 70,000 | SHELRON GROUP | 0.065 | 4,515.00 | 66.25 | | |
| | | | TOTAL | | 6,815.00 | | | |

### ACCOUNT ACTIVITY

**CASH ACCOUNT**

| Date | Transaction | Quantity | Description | Price | Amount | Balance |
|---|---|---|---|---|---|---|
| | | | OPENING BALANCE | | | 2,791.28 |
| 08/31/05 | CREDIT INTEREST | | ADJ - additional 8/31/05 interest | | 1.13 | 2,792.41 |
| 09/01/05 | BOUGHT | 50,000 | BANCORP INTL GROUP UNSOLICITED ORDER   BCIT | .05 | - 2,519.50 | 272.91 |
| 09/30/05 | CREDIT INTEREST | | CR INT 30 DAYS @ 1/2% ANNUAL PERCENT YIELD EARNED .49 | | 0.11 | 273.02 |
| | | | CLOSING BALANCE | | | 273.02 |

EXHIBIT 12

Page 2of 2

Page: 1



**SCOTTRADE INC CUST FBO**
**JAN E HARRIS-KIMBALL IRA**
**PO BOX 1387**
**PHILOMATH OR  97370-1387**

**Branch Office**

SCOTTRADE INC
4641 COMMERCIAL ST SE
SALEM OR 97302

(503) 391-5700

| Account Number | Office |
|---|---|
| ███083 | 3BE |

| Period Beginning | Period Ending |
|---|---|
| 08 / 01 / 2010 | 08 / 30 / 2010 |

## INFORMATION UPDATE

With the updated Scottrade Mobile, you can manage your account and research the market from almost anywhere using your mobile device. Check out our fresh new look and advanced features by visiting www.scottrade.com/mobile

## ACCOUNT SUMMARY

| | VALUE THIS PERIOD |
|---|---|
| VALUE SECURITIES IN POSITION | 33.00 |
| **Y BALANCES :** | |
| ROKERAGE ACCOUNT BALANCE | 27.90 |
| L MONEY BALANCE | 27.90 |
| L ACCOUNT VALUE | 60.90 |

## ACTIVITY SUMMARY

| | |
|---|---|
| OPENING TOTAL MONEY BALANCE | 27.90 |
| **CREDITS:** | |
| DIVIDEND/INTEREST INCOME | 0.00 |
| OTHER CREDITS | 0.00 |
| TOTAL CREDITS | 0.00 |
| **DEBITS:** | |
| DIVIDEND/INCOME EXPENSE | 0.00 |
| OTHER DEBITS | 0.00 |
| TOTAL DEBITS | 0.00 |
| CLOSING TOTAL MONEY BALANCE | 27.90 |

## SECURITY POSITIONS

| Type | Symbol / Cusip | Quantity | Description | Estimated Market | | | Estimated Annual | |
|---|---|---|---|---|---|---|---|---|
| | | | | Price | Value | % | Income | Cur. Ytd |
| CASH | (BCIT) | 50,000 | BANCORP INTL GROUP *NO BUY/NO SELL | 0.00 | 0.00 | 0.00 | | |
| CASH | ILVC | 300 | INTELLIGENT LIVING CORP COM | 0.0041 | 1.23 | 3.73 | | |
| CASH | MRHD | 100 | MERILUS INC COM NEW | 0.021 | 2.10 | 6.36 | | |

EXHIBIT 13

Page 1of 1

**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C.

**SECURITIES EXCHANGE ACT OF 1934**
**RELEASE NO. 52363 / August 31, 2005**

The Securities and Exchange Commission announced the temporary suspension, pursuant to Section 12(k) of the Securities Exchange Act of 1934 (the "Exchange Act"), of trading of the securities of Bancorp International Group, Inc. ("BCIT"), a Nevada corporation, at 9:30 a.m. on August 31, 2005, and terminating at 11:59 p.m. on September 14, 2005.

The Commission temporarily suspended trading in the securities of BCIT because it appears that all of the securities currently trading in the name of Bancorp International Group, Inc. ("BCIT") and purportedly signed by Thomas Megas as President and M. Puig as Secretary are counterfeit. BCIT is quoted on the Pink Sheets LLC.

The Commission cautions brokers, dealers, shareholders, and prospective purchasers that they should carefully consider the foregoing information along with all other currently available information and any information subsequently issued by the company.

Further, brokers and dealers should be alert to the fact that, pursuant to Rule 15c2-11 under the Exchange Act, at the termination of the trading suspension, no quotation may be entered unless and until they have strictly complied with all of the provisions of the rule. If any broker or dealer has any questions as to whether or not he has complied with the rule, he should not enter any quotation but immediately contact the staff in the Division of Market Regulation, Office of Interpretation and Guidance, at (202) 551-5760. If any broker or dealer is uncertain as to what is required by Rule 15c2-11, he should refrain from entering quotations relating to BCIT securities until such time as he has familiarized himself with the rule and is certain that all of its provisions have been met. If any broker or dealer enters any quotation which is in violation of the rule, the Commission will consider the need for prompt enforcement action.

If any broker, dealer or other person has any information which may relate to this matter, the Central Regional Office of the Securities and Exchange Commission should be telephoned at 303-844-1000.

**EXHIBIT AH**

Page 1of 1



## REGULATOR RESPONSE TO BCIT SITUATION.

**Spring 2005.** Mario A. Pino and Pamela J. Thompson printed up fraudulent BCIT certificates and deposited them with two FINRA member brokerages (gatekeepers). Some of those fraudulent certificates were accepted by the Depository Trust Company "DTC" (another gatekeeper). By accepting counterfeit BCIT certificates, FINRA member brokerages and the DTC allowed the Cede & Co. BCIT inventory to be compromised. The FINRA member brokerages and clearing agencies who failed in their gatekeeping duties were identified and the 'counterfeit shares' were accounted for by legal efforts of Bancorp International Group, Inc. (nka Energy Source Inc.) The results of those efforts are documented in the Energy Source Inc. 2006 SEC filings and supplemented by SEC enforcement actions filed in 2008 against Mario A. Pino and Pamela J. Thompson. However, FINRA member brokerages also executed trades outside the DTC system, a common practice, and those trades also resulted in security entitlements for BCIT. It is those trades and the resulting obligations of securities intermediaries to obtain legitimate BCIT certificates that is one of the main issues that needed to be resolved before the DTC would resume clearing services for BCIT. When the DTCC refused to act in good faith to resolve the issue, and ceased communicating with Energy Source Inc.'s legal counsel, Energy Source Inc. in turn ceased filing the periodic reports required by the SEC to continue as a publicly traded Company.

**June 22, 2005** FINRA notifies SEC Enforcement.
    (see next page of exhibit for page 2 of May 4, 2009 letter to US Senator Jeff Merkley from FINRA)

**August 16, 2005,** Depository Trust Company ("DTC") Special Alert re "global lock"
    (see next page of exhibit for page 2 of May 4, 2009 letter to US Senator Jeff Merkley from FINRA with an explaination of DTC global lock)

**August 18, 2005,** Claimant purchase of 30,000 BCIT shares in "ROTH IRA"

**August 29, 2005,** Claimant purchase of 50,000 BCIT shares in "TRAD IRA"

**August 31, 2005,** the SEC instituted a ten day trading suspension in BCIT.
    This was the first public announcement by regulators.
    http://www.sec.gov/litigation/suspensions/34-52363.pdf

**March 3, 2006** BCIT files information statement and settlement agreement.
    http://sec.gov/Archives/edgar/data/1076779/000117266506000072/00011
    72665-06-000072-index.htm

**February 2008,** the SEC takes action against Mario A. Pino and Pamela J. Thompson.
    http://www.sec.gov/news/digest/2008/dig022608.htm
    http://www.sec.gov/litigation/litreleases/2008/lr20466.htm
    http://www.sec.gov/litigation/admin/2008/33-8899.pdf

**November 3, 2009,** the SEC revoked the registration of BCIT shares.



**EXHIBIT 15**

Page 1of 2



Honorable Jeff Merkley
U.S. Senator, Oregon
May 4, 2009
Page 2

scheme. Mr. Pino sold 145,000,000 counterfeit shares of BCIT, earning profits of $269,033 from this fraud scheme.[1]

The SEC investigation was initiated as a result of a referral from FINRA's Fraud Surveillance unit, which had identified indicia of Mr. Pino's scheme and quickly referred the matter to the SEC's Division of Enforcement on June 22, 2005. This referral was made because FINRA does not have jurisdiction over non-registrants or persons associated with such entities. On August 31, 2005, the SEC issued an order temporarily suspending trading of BCIT shares from August 31, 2005 to September 14, 2005.[2] FINRA issued Special Notice to Members 05-60 (September 2005) (copy enclosed) to advise member firms and other interested parties of certain actions and issues relating to the trading of securities of the Company, and to remind members of their responsibilities with respect to SEC Rule 15c2-11 and NASD Rule 6740.

Furthermore, The Depository Trust Company (DTC) issued a special alert (copy enclosed) regarding the Company on August 16, 2005, which included a notice that DTC had discontinued all services relating to the Company, other than custody services, as of August 11, 2005. Since that time, DTC has continued to maintain the securities of the Company in a "global lock," which means DTC will provide custody services of securities held by its participants but will not settle or clear any trades in the Company's securities.

**Enforcement Action**

The SEC's Division of Enforcement conducted an extensive investigation of Mr. Pino's fraudulent scheme, which resulted in enforcement action against Mr. Pino and others. On February 25, 2008, the SEC's Division of Enforcement filed a complaint in the U.S. District Court for the District of Arizona against Mr. Pino for violating the antifraud and securities registration provisions of the federal securities laws in connection with a "pump and dump scheme involving hijacking a public shell and counterfeiting securities."[3] The SEC sought a permanent injunction against Mr. Pino, disgorgement of profits, including pre- and post-judgment interest, third-tier civil penalties, an officer and director bar, and penny stock bar against Mr. Pino. On October 6, 2008, the Court entered a default judgment against Mr. Pino, which provided the relief sought by the SEC

---

[1] See SEC v. Mario A. Pino, Complaint Filed on February 25, 2008, in the United States District Court for the District of Arizona (copy enclosed).

[2] See SEC Order of Suspension of Trading In the Matter of Bancorp International Group, Inc., File No. 500-1, August 31, 2005 (copy enclosed).

[3] See supra note 1.

**EXHIBIT 15**

Page 2 of 2

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

SECURITIES EXCHANGE ACT OF 1934
Release No. 60920 /November 3, 2009

ADMINISTRATIVE PROCEEDING
File No. 3-13638

| | | |
|---|---|---|
| In the Matter of | : | |
| | : | ORDER MAKING FINDINGS AND |
| ENERGY SOURCE, INC. | : | REVOKING REGISTRATION BY |
| | : | DEFAULT |
| | : | |

The Securities and Exchange Commission (Commission) issued its Order Instituting Proceedings (OIP) on October 5, 2009, pursuant to Section 12(j) of the Securities Exchange Act of 1934 (Exchange Act). The OIP alleges that Respondent Energy Source, Inc. (Energy Source), is a corporation with a class of equity securities registered with the Commission pursuant to Section 12(g) of the Exchange Act, which has repeatedly failed to file required periodic reports.

The Office of the Secretary has provided evidence that Energy Source was served with the OIP in accordance with 17 C.F.R. § 201.141(a)(2)(ii) on October 8, 2009. Energy Source's Answer was due ten days from the date of service. See 17 C.F.R. § 201.220(b); OIP at 2. No Answer has been received.

Since Energy Source has not filed an Answer or otherwise defended the proceeding, it is in default. See 17 C.F.R. §§ 201.155(a)(2), .220(f). Accordingly, the following allegations of the OIP are deemed to be true. See 17 C.F.R. § 201.155(a).

Energy Source is a Nevada shell corporation based in Edmond, Oklahoma. Energy Source's common stock is quoted under the ticker symbol BCIT on the Pink Sheets operated by Pink OTC Markets Inc., but PinkSheets.com reports no trades since December 21, 2007. The Commission approved a ten-day temporary trading suspension of Energy Source's (then known as Bancorp International Group, Inc.) common stock on August 30, 2005.

Energy Source has failed to file its last six required periodic reports and is over one year delinquent in its periodic filing obligations. Specifically, it has failed to file any Forms 10-Q for the quarters ended June 30, 2009, March 31, 2009, September 30, 2008, June 30, 2008, and March 31, 2008, or a Form 10-K for the year ended December 31, 2008. Moreover, Energy

EXHIBIT 16

Page 1of 2

Source is a habitual delinquent filer. Over the past ten years, Respondent has filed on time just two of forty-two required periodic filings.

Exchange Act Section 13(a) and the rules promulgated thereunder require issuers of securities registered pursuant to Exchange Act Section 12 to file with the Commission current and accurate information in periodic reports, even if the registration is voluntary under Section 12(g). Specifically, Exchange Act Rule 13a-1 requires issuers to file annual reports, and Exchange Act Rule 13a-13 requires domestic issuers to file quarterly reports.

As a result of the conduct described above, Energy Source has failed to comply with Section 13(a) of the Exchange Act and Rules 13a-1 and 13a-13 thereunder. Considering its delinquencies, it is necessary and appropriate for the protection of investors to revoke the registration of each class of registered securities of Energy Source.

## ORDER

IT IS ORDERED THAT, pursuant to Section 12(j) of the Securities Exchange Act of 1934, the registration of each class of registered securities of Energy Source, Inc., is hereby REVOKED.

_____
Robert G. Mahony
Administrative Law Judge




EXHIBIT

Page 2 of 2

Copyright (c) 2002 Loyola of Los Angeles Law Review
Loyola of Los Angeles Law Review

April, 2002

35 Loy. L.A. L. Rev. 661

LENGTH: 55583 words

ARTICLE: UCC ARTICLE 8: WILL THE INDIRECT HOLDING OF SECURITIES
SURVIVE THE LIGHT OF DAY?

NAME: Russell A. Hakes*

BIO: * Associate Professor of Law, Widener University School of Law.

### 4. Who holds indirectly?

The vast majority of publicly held securities are represented by jumbo certificates
registered in the name of Cede & Co., the nominee of the Depository Trust Company
(DTC). n132 Approximately 600 banks and brokers have accounts at the Depository Trust
Company for their own holdings and for the holdings of those for whom they act as
securities intermediaries. n133 There are frequently additional tiers of indirect holding
whereby intermediaries who are not members of DTC hold through securities accounts
with intermediaries who are members. n134 In other words, the Depository Trust
Company holds the securities directly and the banks and brokers, as well as their
customers hold them indirectly as security entitlements. This same system can be used for
corporate and municipal debt securities and for commercial paper. n135 This is not the
only indirect holding system in existence but it is the largest.
Some concerns that have been raised regarding Article 8 relate to the perception that it
does not adequately protect consumers. n136 This seems to presume that consumers are
the primary indirect holders. Essential to understanding security entitlements and the
indirect holding system is the realization that securities intermediaries are generally also
entitlement holders. Usually, the securities intermediary is a bank or broker and the
financial asset is [*686] held indirectly by that intermediary and held directly by the
Depository Trust Company or another clearing corporation. n137 There may be more than
two tiers of indirect holding for any financial asset. While this could be criticized as
creating multiple levels of risk for the ultimate entitlement holder, these levels of risk are
mitigated to a significant extent by the fact that Article 8 makes the immediate securities
intermediary effectively a guarantor of any upper tier securities intermediaries. n138





EXHIBIT 18

Page 1 of 1

The ABC's of the UCC: General Provisions
By Frederick H. Miller, Amelia H. Boss
CHAPTER FIFTEEN
GOOD FAITH 1-304

Section 1-304 imposes an obligation of good faith in the perfor-
mance or enforcement of every contract or duty under the Code.
To be consistent with the changes in other articles of the Code
(except Article 5), the definition of good faith has been expanded
from simple "honesty in fact" (former 1-201(19) to include
"the observance of reasonable commercial standards of fair deal-
ing," 1-201(b)(19). While the definition only operates with
respect to contracts or duties under Article 1 (see, e.g., 1-306
on waiver and Comment 1 thereto and 1-309 on iption to accel-
erate at will), a good illustration of how the concept generally is
intended to operate is furnished by 8-504(a).

Section 8-504(a) requires a securities intermediary to obtain
and maintain a financial asset in a quantity corresponding to the
aggregate of all security entitlements to that financial asset that it
has established for its entitlement holders-that is, equal to the
assets it is obligated by agreement to acquire and hold for its cus-
tomers. In short, if a broker has purchased 100,000 shares of
XYZ stock for its customers, it must have that amount of XYZ
stock available if those customers wish to sell or obtain share cer-
tificates. How is this statutory duty to be performed? Under
8-504(c)(2), in absence of agreement, it must be performed
with due care in accordance with reasonable commercial stan-
dards, or under 8-504(c)(1), as agreed upon with its customer.
In this latter context, the duty of good faith limits freedom of
contract. It would not be consistent with the duty of good faith
for the agreement to disclaim altogether this basic element of the
relationship between the broker and its customers, such as by
assuming no responsibility for maintaining any of its customers'
security positions. 8-504 Comment 4. However, the agree-
ment, consistent with good faith and applicable government reg-
ulation, might provide that if another broker fails to make a
delivery there is a certain period of time in which to clear up the
problem before the acquiring broker is obligated to obtain the
necessary securities from another source.



EXHIBIT 19

Page 1 of 1

**39**

http://www.law.uc.edu/CCL/34ActRls/rule15c3-3.html

**Rule 15c3-3 -- Customer Protection—Reserves and Custody of Securities**

b. *Physical possession or control of securities.*

1. A broker or dealer shall promptly obtain and shall thereafter maintain the physical possession or control of all fully-paid securities and excess margin securities carried by a broker or dealer for the account of customers.

2. A broker or dealer shall not be deemed to be in violation of the provisions of paragraph (b)(1) of this section regarding physical possession or control of customers' securities if, solely as the result of normal business operations, **temporary** lags occur between the time when a security is required to be in the possession or control of the broker or dealer and the time that it is placed in his physical possession or under his control, provided that the broker or dealer takes timely steps in good faith to establish prompt physical possession or control. The burden of proof shall be on the broker or dealer to establish that the failure to obtain physical possession or control of securities carried for the account of customers as required by paragraph (b)(1) of this section is merely temporary and solely the result of normal business operations including same day receipt and redelivery (turnaround), and to establish that he has taken timely steps in good faith to place them in his physical possession or control.

l. *Delivery of securities.* Nothing stated in this section shall be construed as affecting the absolute right of a customer of a broker or dealer to receive in the course of normal business operations following demand made on the broker or dealer, the physical delivery of certificates for:

1. Fully-paid securities to which he is entitled, and,

2. Margin securities upon full payment by such customer to the broker or dealer of his indebtedness to the broker or dealer; and, subject to the right of the broker or dealer under section 7(b) of Regulation T to retain collateral for his own protection beyond the requirements of Regulation T, excess margin securities not reasonably required to collateralize such customer's indebtedness to the broker or dealer.





EXHIBIT **20**

Page 1 of 2



http://www.finra.org/web/groups/industry/@ip/@reg/@rules/documents/interpretationsfor
/p037772.pdf

## CUSTOMER PROTECTION – RESERVES AND CUSTODY OF SECURITIES
### SEA Rule 15c3-3

2531
© 2008 Financial Industry Regulatory Authority, Inc.
(I)  DELIVERY OF SECURITIES

Nothing stated in this rule shall be construed as affecting the absolute right of a customer
of a broker or dealer to receive in the course of normal business operations following
demand made on the broker or dealer, the physical delivery of certificates for:

1.  Fully-paid securities to which he is entitled, and

2.  Margin securities upon full payment by such customer to the broker or dealer of
    hisindebtedness to the broker or dealer; and, subject to the right of the broker or
    dealer   under Sectionof Regulation T to retain collateral for his own protection
    beyond the requirements of Regulation T, excess margin securities not reasonably
    required to collateralize such customer's indebtedness to the broker or dealer.

EXHIBIT 20

Page 2of 2

**16. Events of Default.** The following shall constitute an "Event of Default": (a) You fail to make payment as and when required pursuant to this Agreement; (b) You fail to provide margin or to perform any other Obligations as and when we require; (c) Any representation or warranty made by you shall have been incorrect or untrue in any material respect when made or repeated or deemed to have been made or repeated; (d) You state that you will not perform any of the Obligations under this Agreement; (e) You default in the performance of any Obligation to us under any agreement now or hereafter entered into; (f) You default in the payment of any indebtedness for borrowed money, or any guaranty of such indebtedness, upon the maturity (including any accelerated maturity) thereof; (g) You apply for, consent to or are the subject of an application or petition for the appointment of, or the taking of possession by, a receiver, custodian, trustee, liquidator or similar person of all or a substantial part of your property, admit in writing your inability or become unable to pay your debts generally as such debts become due, make a general assignment for the benefit of creditors, file or are the subject of the filing or entry of a petition or order for relief under Title 11 of the U.S. Code or any similar law of any jurisdiction regarding reorganization, liquidation, dissolution, insolvency, or relief of debtors or of an application for a protective decree under the Securities Investor Protection Act of 1970; or (h) We believe that we may be unable to apply without delay property that we are holding or expect to receive from you against any Obligation to us under this Agreement or in connection with any transactions executed by us on your behalf.

**17. Remedies.** Upon the occurrence of any Event of Default, we may, in our sole and absolute discretion and without notice to you: (a) cancel or otherwise liquidate your Account and any position therein or transaction in your Account; (b) sell off any Obligation owed by us to you against any Obligation of yours, or against any Collateral; (c) satisfy any Obligation of yours to us from any Collateral; (d) sell, or be deemed to have sold, any securities, instruments or other property in your Account; and (e) purchase, or be deemed to have purchased, any securities, instruments or other property, in which you have a short position. All purchases or sales pursuant to this Section may be affected in public or private purchases or sales in which we may be the purchaser or seller, in each case, as we may deem appropriate in our sole and absolute discretion and at such price or prices as we may deem satisfactory in our sole and absolute discretion. You are not entitled to any advance notice to any such remedies by us. In our sole and absolute discretion, we may (but are not required) to attempt to notify you or to provide a grace or notice period before we exercise such remedies. However, any such grace or notice period may be shortened or eliminated by us without further notice to you if we believe it is appropriate to do so for our protection. We may exercise remedies under this Section without notice notwithstanding any prior grace or notice period provided to you.

**18. Free Credit Balances, Funds Availability, and Bank Deposit Program.** You understand and agree that Scottrade may place and hold your available cash balances in your Scottrade brokerage account as free credit balances, in our Bank Deposit Program as described in Addendum 8, or through other arrangements that Scottrade may make available. We may change or replace the above options in our discretion. We may, in our sole and absolute discretion, pay you interest on any free credit balances awaiting investment. A free credit balance is the sum of the uninvested cash in your Account less the funds required to pay for purchase transactions due to settle on or after the day the free credit balance is to be calculated, charges to your Account, and credit balances that are Collateral for your Obligations. Free credit balances are not bank deposits and are not insured by the FDIC. If you receive interest on these free credit balances, you agree that you maintain the free credit balances in your Account for investment purposes, and not solely for the purpose of receiving interest. We reserve the right to stop paying interest on free credit balances, close your Account or to take any other action necessary if we determine that you are maintaining free credit balances with Scottrade solely for the purpose of receiving interest. We may increase or decrease the rate of interest or decide to stop or start paying interest at anytime in our sole and absolute discretion. Our use of credit balances in our business is subject to the limitations of SEC Rule 15c3-3. You have the absolute right to receive, in the normal course of business, any free credit balance and any fully paid securities to which you are entitled, subject to any open commitments in your Account.

**19. SIPC and Other Insurance Coverage.** You understand that we are members of the Securities Investor Protection Corporation ("SIPC") and that SIPC currently protects the assets in your Account up to $500,000, with a limit of $250,000 for cash balances, which are being held for purposes of investment. Cash balances not held for investment purposes (e.g. the sole purpose is to collect interest) may not be covered by SIPC. You acknowledge that these SIPC protections do not cover fluctuations in the market value of your securities. A brochure with the details of SIPC's protections is available at www.sipc.org or by calling (202) 371-8300.

**20. Control or Restricted Securities.** Scottrade does not generally handle the sale of control or restricted securities. You agree to notify us if you have deposited or seek to deposit any unregistered, restricted, or control securities in your Account. You agree not to enter sell orders with Scottrade for securities that are subject to Rule 144 or 145(d) of the Securities Act of 1933. You agree to pay for any loss Scottrade may incur in closing out any such intentional or unintentional sales. If you elect to deposit any control or restricted securities in your Account, you understand and agree that you will not sell such securities through your Account.

**21. Responsibility Regarding Certain Securities.** You are responsible for knowing the rights and terms for all securities bought, sold and maintained at Scottrade, including but not limited to stock splits, reorganizations, mergers, name changes, symbol changes, dividends (including stock dividends), option symbols, and option deliverables and any available insurance coverage, including the limitations on such coverage. Scottrade may, but is not obligated to, notify you of any upcoming expiration or redemption dates, or take any action on your behalf without your specific instructions except as required by law and the rules of regulatory authorities. Certain securities may grant you valuable rights that may expire unless you take specific action. These securities include bonds, convertible securities, warrants, stock rights and securities subject to exchange offers or tenders. You are responsible for knowing all expiration dates, redemption dates, and the circumstances under which rights associated with your securities may be called, cancelled, or modified. If any such security is about to expire worthless or be redeemed for less than its fair market value and instructions have not been received from you, we may, at our discretion, sell the security and credit your Account with the proceeds. If an Account has an option position on the last trading day prior to expiration that is $0.01 or more in-the-money, the option is subject to automatic exercise. However, Scottrade reserves the right at its sole discretion to close any option position prior to expiration date or any position resulting from the exercising/assignment after option expiration. You will be charged a brokerage commission for any such transaction. Scottrade is not obligated to take any of these actions and we are not liable for losses should we not do so. Securities traded in the over-the-counter bulletin board and pink sheets and other thinly-traded securities may present particular trading risks in that they can be more volatile and are generally less liquid than securities traded on exchanges. Scottrade reserves the right to place restrictions on the trading of such securities, or any other securities for any reason, without prior notice

**22. Communication Between Companies and Shareholders.** As required by SEC rules, we will release your name, address, and security positions to requesting companies in which you own shares that are held in your Account, unless we receive notice from you in writing that you object to us providing this information.

**23. Privacy Disclosures.** Addendum 2 to this Agreement is our "Privacy Policy and Security Statement." It describes how we protect your personal and financial information that we collect in the course of providing financial services to you. You acknowledge that you have received and read Addendum 2.

**24. Mutual Fund Investing.** You may invest in a variety of mutual funds in your Account through Scottrade. The information and services provided by Scottrade are not to be considered an offer to sell or a solicitation of an offer to buy a particular fund. Fund purchases may be subject to investment minimums, and all fund transactions are subject to acceptance by us and/or the fund company. By entering a mutual fund transaction through Scottrade, you acknowledge that you have received and read the fund prospectus, which describes the risks associated with the investment. Some mutual funds available through Scottrade may impose a sales charge on the purchase of shares of the fund. These charges are known as a "sales load." You may also be able to purchase mutual fund shares without paying a front-end sales load, although you may be charged a "contingent deferred sales charge" (i.e. back-end load) upon the sale or redemption of the shares. These charges may not be included in the fund's performance data. We may receive all or part of a sales load in connection with your investment in the fund's shares. Please consult the fund's prospectus for more information. Some mutual funds offer reductions in front-end sales loads, known as breakpoints, for purchases over certain amounts. In addition, such discounts may be available through Letters of Intent or Rights of Accumulation. You acknowledge that you are solely responsible for determining and obtaining breakpoints and rights of accumulation. Addendum 3 is a Disclosure Statement entitled "Mutual Fund Breakpoint Discount". This document describes various issues in purchasing load mutual funds. You acknowledge that you have received and read Addendum 3. Additional information about mutual fund breakpoints is available from FINRA at its website www.finra.org. Please consult the fund's prospectus for more information. Some mutual funds impose a marketing distribution fee known as a "12b-1 fee." This fee is included in the computation of the fund's overall expense ratio and is reflected in the fund's performance data. We may receive all or part of the 12b-1 fees in connection with your investment in the fund's shares. Please consult the fund's prospectus for more information.

**25. No Transaction Fee Mutual Fund Program.** You may participate in our No-Transaction Fee Mutual Fund Program ("NTF Program") in your Account. This program allows you to invest online in no-load mutual funds through Scottrade without paying a sales load or transaction fee. NTF mutual funds purchased through a Scottrade broker instead of online are subject to transaction fee set forth on our commission schedule. We may receive compensation directly from participating fund companies or third parties in payment for the fund distribution services that we provide. This compensation is included in the fund's overall expense ratio and is reflected in the fund's performance data. Please consult the fund's prospectus for more information. By participating in the NTF Program, you agree to the terms and conditions of the program as set forth in the Important Mutual Fund Information section of our website, which is subject to change at any time without prior notice to you. You acknowledge that we may modify or discontinue the NTF program without prior notice to you. By entering into a mutual fund transaction through us, you acknowledge that you have received and read the fund prospectus, which describes the risks associated with the investment. Funds that are not part of our NTF program are subject to the transaction fees set forth in our commission schedule.



EXHIBIT 21

Page 1 of 2



**26. International Accounts.** We may open Accounts for non-resident aliens that are required to complete a Form W-8 for tax withholding purposes (International Accounts). We do not promote ourselves, nor hold ourselves out, as doing business outside the United States. Since this agreement is not binding until approved and accepted by us in the United States, this agreement shall be deemed to be a contract made in the United States. All services to be performed by us shall be performed solely in the United States in United States dollars. You understand that an International Account must be an Internet Account. A Scottrade office in the United States will service your Account because we do not have offices outside the United States. Notifications will be provided to you solely in electronic form through e-mail and notices posted to your particular Account on Scottrade's website. You further understand that you may only fund the Account with wired funds, personal checks, cashier's checks and/or money orders drawn on United States banks. Our website shall not be considered a solicitation for or offering of any investment product or service in any jurisdiction where such solicitation or offering would be illegal.

**27. FINRA Public Disclosure Program.** As a member of FINRA, Scottrade is required to disclose the availability of BrokerCheck, an online tool that provides information on FINRA-registered firms. To access BrokerCheck or download a brochure, go to *www.finra.org/brokercheck*. You can also call the BrokerCheck Hotline at (800) 289-9999.

**28. Arbitration Disclosures.** This Agreement contains a predispute arbitration clause. By signing this Agreement, the parties agree as follows:

   A) All parties to this Agreement are giving up the right to sue each other in court, including the right to a trial by jury, except as provided by the rules of the arbitration forum in which a claim is filed.
   B) Arbitration awards are generally final and binding; a party's ability to have a court reverse or modify an arbitration award is very limited.
   C) The ability of the parties to obtain documents, witness statements and other discovery is generally more limited in arbitration than in court proceedings.
   D) The arbitrators do not have to explain the reason(s) for their award.
   E) The panel of arbitrators will typically include a minority of arbitrators who were or are affiliated with the securities industry.
   F) The rules of some arbitration forums may impose time limits for bringing a claim in arbitration. In some cases, a claim that is ineligible for arbitration may be brought in court.
   G) The rules of the arbitration forum in which the claim is filed, and any amendments thereto, shall be incorporated into this agreement.

**29. Agreement to Arbitrate Controversies.** You agree that any controversy, dispute, claim, or grievance between us, any of our affiliates or our or their shareholders, officers, directors employees, associates, or agents, on the one hand, and you or, if applicable, your shareholders, officers, directors employees, associates, or agents on the other hand, arising out of, or relating to, this Agreement, or any service provided by us, including transactions of any kind made on your behalf through us, shall be resolved by Financial Industry Regulatory Authority (FINRA) arbitration, in accordance with FINRA's Code of Arbitration Procedure. If you are not a resident of the United States at the time a controversy subject to arbitration arises, you agree that any arbitration hearing shall be held in St. Louis, Missouri; you consent to the personal jurisdiction of all courts located in the State of Missouri for purposes of enforcing this arbitration agreement and any arbitration award; and you agree that any arbitration proceeding shall be conducted in the English language. If any party unsuccessfully resists confirmation or enforcement of an arbitration award rendered under this agreement, then all costs, attorneys' fees, and expenses incurred by the other party or parties in confirming or enforcing the award shall be fully assessed against and paid by the party resisting confirmation or enforcement of the award.

**30. Class Actions.** No person shall bring a putative or certified class action to arbitration, nor seek to enforce any pre-dispute arbitration agreement against any person who has initiated in court a putative class action; or who is a member of a putative class until: (a) the class certification is denied; or (b) the class is decertified; or (c) the customer is excluded from the class by the court. Such forbearance to enforce an agreement to arbitrate shall not constitute a waiver of any rights under this Agreement except to the extent stated herein.

**31. Consent to Monitoring and Recording.** You understand that we may, in our sole and absolute discretion, monitor or tape record telephone conversations with you, and you consent to such monitoring or recording. We are not required to record all telephone conversations and do not guarantee that recordings of any particular telephone conversation will be retained or are capable of being retrieved. You acknowledge that we do not accept orders left on voicemail and you agree not to leave any instructions for us on voicemail to enter a securities transaction for you.

**32. E-mail and Electronic Communications.** All e-mail sent to and from us is subject to monitoring, review by or disclosure to someone other than your intended recipient. You acknowledge that there may be delays in e-mail being received by your intended recipient. You agree to hold us harmless for any delay in e-mail delivery regardless of whether the delay was caused by us or a third party. E-mail sent to and from a Scottrade address may be retained by our corporate e-mail system. You agree not to use e-mail to transmit orders to purchase or sell a security and further agree that Scottrade is not liable for any actions taken or any omissions to act as a result of any e-mail message you send to us. Electronic communications with Scottrade via our website, wireless device or touchtone service are also subject to monitoring, review by or disclosure to someone other than the recipient and such communications may be retained by Scottrade.

**33. Complaints.** You may direct complaints to your local Scottrade branch or Scottrade's national service center at support@scottrade.com or by calling 1-800-619-SAVE. Written complaints may be sent to Scottrade, Inc., Attn: Compliance Department, 500 Maryville Center Drive, St. Louis, MO 63141-5814.

**34. Applicable Rules and Regulations.** You acknowledge that this Agreement and all orders and transactions executed in your Account shall be subject to all applicable federal and state laws and regulations, and the constitution, rules, regulations, customs, usages, rulings and interpretations of the exchange or market and its clearinghouse (if any) where such transactions are executed.

**35. Governing Law and Assignment.** This Agreement and its enforcement shall be governed by the laws of the State of Missouri (without regard to its conflict of law provisions); shall cover individually and collectively all of your Account(s) which you may open or reopen with us; shall inure to the benefit of our successors and assigns, whether by merger, consolidation or otherwise; and shall be binding upon your heirs, executors, administrators, successors, and personal representatives, together with all other persons claiming any legal or beneficial interest through you or in your Account(s). You may not assign the rights and duties hereunder without first obtaining our prior written consent. We may assign our rights and duties under this Agreement and may transfer your Account and this Agreement to our successors and any affiliated assigns without notice, or to any other entity with prior notice to you.

**36. Losses Due to Extraordinary Events; Limitation of Liability.** We shall not be liable for loss caused directly or indirectly by war, strikes, natural disasters, terrorist acts, government restrictions, exchange or market rulings, suspensions of trading, computer or communications line failures, or delays in the transmission of orders due to a breakdown or failure of market centers or transmission facilities or other conditions beyond our reasonable control.

**37. Entire Agreement and Severability.** This Agreement, any attachments hereto, and the terms and conditions contained in statements and confirmations, contain the entire agreement between the parties with respect to the subject matter hereof. If any provision or condition of this Agreement shall be held to be invalid or unenforceable by any court, or regulatory or self-regulating agency or body, such provision shall be deemed modified, or, if necessary, rescinded in order to comply with the relevant court, or regulatory or self-regulatory agency or body. The validity of the remaining provisions and conditions shall not be affected thereby, and this Agreement shall be carried out as if such invalid or unenforceable provision or condition was no contained herein. You acknowledge that you have entered into this Agreement and will enter into transactions in consideration of and in reliance upon the understanding that all such transactions constitute a single business and contractual relationship and have been made in consideration of each other. Accordingly, in addition to any of the other rights and obligations set forth in the Agreement, (a) you agree to perform all of your obligations in respect of each such transaction, (b) we shall be entitled to setoff claims and apply property held by us in respect of any such transaction or otherwise against obligations owing to us in respect of any other such transaction or otherwise, and (c) payments, deliveries and other transfers made by us in respect of any such transaction shall be deemed to have been made in consideration of payments, deliveries and other transfers in respect of any other such transaction, and the obligations to make any such payments deliveries and other transfers may be applied against each other and netted by us.

**38. Amendments.** Scottrade may amend, change, revise, add or modify this Agreement at any time. The current version of the Agreement will be posted on our website, _____ , and you understand that your continued Account activity after such amendment constitutes your acceptance to be bound by all amendments to the Agreement. In addition, you understand that this Agreement may not be modified by any verbal statements or written amendments that you seek to make to the Agreement without written acceptance from the General Counsel of Scottrade.



**EXHIBIT 21**

Page 2 of 2

Hollace Steele
FINRA Dispute Resolution
One Liberty Plaza
165 Broadway, 27th Floor
New York, NY 10006

June 18, 2011

Re: Harris-Kimball v Scottrade Inc.  case # 11-00018


Dear Ms. Steele:


Enclosed are two copies I have titled  Supplemental Claim Submission and I am requesting they
be included with my claim documents sent to the Arbitrator.


I mailed a copy to Respondent's attorneys, Mr. Murphy and Mr. Graves, via certified  mail and
am including a certificate of service.



Sincerely,



Jan E. Harris-Kimball
PO Box 1387
Philomath, Oregon 97370
541.757.7494


cc via certified mail

Niels P. Murphy and Lawton R. Graves, c/o Murphy & Anderson, P.A.


Harris-Kimball v Scottrade case # 11-00018

Jan E Harris-Kimball et al.

Claimants

v.                                    Case No. 11-00018

Scottrade, Inc.

Respondent


June 18, 2011




## SUPPLEMENTAL CLAIM SUBMISSION

1.  Introduction
2.  Scottrade's Custodial Duties
3.  Book-Entry Delivery vs Physical Delivery
4.  Claimants Right to Enforce Delivery
5.  Scottrade's Custodial Duty to Promptly Obtain Securities -SEC Staff Interpretation
6.  Fraud in the Pink Sheet Markets
7.  Due Care-Reasonable Commercial Standards
8.  Trading Restrictions -The Securities and Exchange Commission
9.  Trading Restrictions -Scottrade
10. Energy Source Inc. Securities are Transferable
11. DTC Non-Transferable and Global Lock
12. Conclusion
13. Exhibits

Jan E Harris-Kimball et al.

Claimants

v.                                              Case No. 11-00018

Scottrade, Inc.

Respondent


## 1. INTRODUCTION

I am submitting additional information which supports my claim that 1.) Scottrade has ongoing custodial duties associated with the BCIT security entitlements in my account, including the obligation to provide me Energy Source Inc. certificates; 2.) that I have the right to enforce that obligation and although it might be inconvenient for Scottrade, it is not impossible for them to perform; and 3.) that fifteen cents per share is also recognized by the DTC as the price per share for BCIT cusip # 05968X106.

There are at least three different functions that the firms we call stock -brokers commonly perform for their clients: (1) the investment advisory function, (2) the trade execution function, and (3) the custodial function.

For purposes of Revised Article 8, the important point is to distinguish the custodial function from the other roles played by securities firms, for even in an arrangement in which these functions are all performed by the same entity, the indirect holding system rules in Revised Article 8 come into play only with respect to the custodial function.

*See* Exhibit 36 Policy Perspectives on Revised Article 8 by James S. Rogers

## 2. SCOTTRADE'S CUSTODIAL DUTIES

The rules governing the clearance and settlement system and Scottrade's custodial duties are described in Revised Uniform Commercial Code (UCC) Article 8 and The Customer Protection Rule, SEC Rule 15c3-3.

Revised UCC Article 8 uses carefully constructed terms such as "securities account", "security entitlement", "entitlement holder", "entitlement order" and "securities intermediary" to define the rights and duties of participants *See* Revised UCC 8-102 Definitions. The rules provide legal certainty in securities transactions because the rules are based on accounts; discrete pairwise relations between parties where obligations are enforceable at each level and independent of the obligations at the next level.

Part 5 of Revised UCC Article 8 explains how one obtains a "securities entitlement" and delineates a securities intermediary's duties: (1) UCC 8-504, to maintain financial assets sufficient to satisfy the claims of its entitlement holders; (2.) UCC 8-505, to obtain payments or distributions( e.g. dividends on stock); (3.) UCC 8-506, to exercise rights of the financial assets; (4.) UCC 8-507, to comply with entitlement holder's orders; and (5) UCC 8-508, to change the form of the entitlement holder's position (e.g., the delivery of a securities certificate registered in the name of the former entitlement holder).

The obligations a securities intermediary owes an entitlement holder are the same whether the security entitlement is for a pink sheet stock or for a NYSE stock; and those obligations, described in Part 5 of Revised UCC Article 8, are ongoing as long as the intermediary--entitlement holder relationship exists. The SEC regulates compliance with Rule 15c3-3 and investors rely on commercial and contract law to enforce their rights created under Revised UCC Article 8. Failure by a securities intermediary to perform the duties created by Revised UCC Article 8 constitutes a breach of contract *See* UCC 1-304 Obligation of good faith.

Harris-Kimball v Scottrade case # 11-00018

### 3.  BOOK-ENTRY DELIVERY   VS   PHYSICAL DELIVERY

In the **indirect holding system**, "delivery" occurs when funds are exchanged for a security entitlement and a credit is made to the customer's account.   Respondent Scottrade executed my BCIT trades properly and my account statements and trade confirmations confirm that my funds were exchanged for BCIT securities entitlements and book-entry delivery occurred. The BCIT security entitlements in my Scottrade accounts are valid and legally enforceable entitlements for Energy Source Inc. common stock.

### 4.  CLAIMANT'S RIGHT TO ENFORCE PHYSICAL DELIVERY

My claim against Scottrade is for all the Energy Source Inc. securities that the entitlements in my IRA accounts represent.  I am able to enforce my property interest against Scottrade by requesting physical delivery of Energy Source Inc. certificates (UCC 8-508) whether or not Scottrade has possession or control of the BCIT securities.

**The entitlement holder's rights against the securities intermediary do not depend on whether or when the securities intermediary acquired its interests.**

The duty of a securities intermediary to maintain sufficient assets is governed by section 8-504 and regulatory law. Subsection (c) is included only to make it clear the question whether a person has acquired a security entitlement does not depend on whether the intermediary has complied with that duty.

*See* Revised UCC 8-501 Comment 3 ( emphasis added).

(c) An entitlement holder's property interest with respect to a particular financial asset under subsection (a) **may be enforced against the securities intermediary** only by exercise of the entitlement holder's rights under sections 8 - 505 through 8 - 508.

*See* Revised UCC 8-503  Property interest of entitlement holder ( emphasis added).

## 5. SCOTTRADE'S CUSTODIAL DUTY TO PROMPTLY OBTAIN SECURITIES

### SEC Staff Interpretation

PROTECTION OF CUSTOMER SECURITIES          Rule 15c3-3 and UCC 8-504

As stated earlier, paragraph (b) of the Customer Protection Rule requires the broker or dealer to **promptly obtain and thereafter maintain possession or control** of all fully-paid and excess margin securities carried by a broker or dealer for the account of customers.

In interpreting the possession or control provisions of the rule, the [SEC] staff, of course, is primarily concerned with ensuring that adequate securities are available to satisfy customer claims in the event of a liquidation. In addition to liquidation concerns, the [SEC] staff is also aware that the broker-dealer's custodial responsibilities are not limited to the requirements of the rule. The [SEC] staff understands that if a broker-dealer willfully does not obtain and maintain possession or control of fully-paid customer securities, that broker-dealer may be **committing the tort of conversion.** In certain circumstances that conversion may be considered a fraud. From the staff's point of view, by virtue of account statements and other information sent to the customer the broker-dealer impliedly represents to the customer that it is holding the customer's securities for it and has an obligation (perhaps a fiduciary one) to do so.

Because of the [SEC] staff's concern regarding its view of the broker-dealer's custodial responsibilities, it is important to note that in order to satisfy the possession or control requirement of the Customer Protection Rule, **the broker-dealer must have in its possession or control** the securities that are in fact the same as the securities that the customer is holding. For example, if a customer is holding shares of freely tradable class A common stock, the broker-dealer must hold that particular class and issue to satisfy the possession or control requirement.

*See* May 2002 Business Lawyer; The Customer Protection Rule by Michael P. Jamroz ( emphasis added)

## 6.  FRAUD IN THE PINK SHEET MARKETS

Even though FINRA member brokerages are SEC regulated, the companies whose shares trade on the pink sheets have little oversight, consequently, fraud in the pink sheet markets is a fact of life. The issuance and distribution of unregistered shares by company insiders, promoters and shell hijackers through FINRA member brokerages happens not only on the pink sheets but on other trading venues as well. When those unregistered shares are introduced into the supply of shares actively trading, the increase in volume attracts traders and increases profits to brokerages and market participants who execute the transactions. All participants in the market must manage risk. To do that, brokerages and clearing agencies often place trading restrictions on specific securities; for investors, risk management includes carefully choosing the intermediary who will execute their trades and safeguard their funds and securities.

Mario A. Pino and Pamela J. Thompson created and issued unregistered BCIT shares in 2005 and then deposited the shares into FINRA member brokerage accounts, not unlike what happens every week in the pink sheet markets for one security or another. A look through FINRA and SEC filings and litigation releases shows how prevalent sales of unregistered shares are.

What is unusual is for a pink sheet CEO to expend time and money to clean up after the promoters and hijackers as BCIT's CEO has done. Among other things, BCIT increased the authorized share count to cover the unregistered shares and brought legal proceedings against those responsible and their promoters; BCIT retained an auditor, brought several years of SEC filings up to date, obtained a new cusip number and announced a share exchange which satisfied the regulators but, the DTCC refused to lift the global lock, refused to acknowledge the transfer agent, refused to exchange shares and since September 2008 has refused to communicate with BCIT or its legal counsel.

Harris-Kimball v Scottrade case # 11-00018

## 7. DUE CARE  REASONABLE COMMERCIAL STANDARDS

By January 2006 the DTC had removed the unregistered shares and BCIT had made available validly issued shares to fulfill brokerage's obligations. Because the brokerages were cautioned by the regulators to ensure delivery was made and to settle their obligations broker to broker, the brokerages were excused from their obligation to **promptly** obtain, possess or control BCIT securities, however, they were not  absolved of that duty.

A seller's obligation to deliver securities does not go away. And the broker/dealer who acts as a buyer of securities has a regulatory entitlement and the power -- and, in many cases, an affirmative obligation after a period of time -- to execute a buy-in on a failed delivery to force the seller to fulfill its obligations.

*See* July 6, 2007 DTCC press release titled *: DTCC Responds to The Wall Street Journal article "Blame the Stock Vault"*. ( emphasis added )

While the Revised Article 8 performance standard of "due care in accordance with reasonable commercial standards" would certainly excuse an intermediary from its usual obligation of prompt delivery of certificated securities in a case like that, it is worth noting that the Revised Article 8 formulation is not the equivalent of a standard that would absolve an intermediary from responsibility for all accidents. "Reasonable commercial  standards" in this context would mean the standards of professional securities custodians, whose principal reason for existence is to provide, for a fee, a level of expertise in securities  processing  that  avoids  or minimizes the risk of accidents.

*See* Exhibit 35 Policy Perspectives on Revised Article 8 by James S. Rogers p. 1507 ( emphasis added )

## 8. TRADING RESTRICTIONS: THE SECURITIES AND EXCHANGE COMMISSION

The SEC, who has the authority to suspend a security from trading on a public exchange, temporarily suspended BCIT securities for 10 days on August 31, 2005. After the 2005 ten day suspension ended, regulators cautioned brokerages that "all trades need to be settled broker to broker" and "Any sales should be effected only to the extent the member organization is confident that delivery can be made" *See* Supervision of Trading Bancorp International Group September 14, 2005 NYSE Information Memo.

Between September 15, 2005 and November 2, 2009, there was no SEC order restricting the trading of BCIT securities on a public exchange.

There is no SEC order currently in effect which would prohibit the trading of BCIT shares, nor is it within the purview of the SEC to clear trading in any particular security. On August 31, 2005, the Commission suspended trading in the securities of BCIT for a period of ten days due to questions regarding the authenticity of the BCIT securities and the accuracy of statements in press releases. That trading suspension elapsed in 2005.

See Exhibit 37, July 2009 SEC Chairman Mary Shapiro letter to US Senator Grassley.

On November 3, 2009, the SEC revoked the registration of Energy Source Inc. securities and permanently suspended them from trading on a public exchange. There is no SEC order or regulation preventing Scottrade from providing me the Energy Source Inc. certificates that I am entitled to. Revocation of share registration is not a death sentence, and it does not render the shares or the company worthless. Companies cease being publicly traded for many reasons, and it is within the normal course of business.

In May 2010, I obtained, from a FINRA member brokerage firm, a physical certificate for the SEC revoked, permanently suspended, pink sheet stock Genomed (GMED), within three weeks of my request.

## 9. TRADING RESTRICTIONS:  SCOTTRADE

Trading restrictions, whether imposed by the SEC or Scottrade do not absolve Scottrade of the custodial obligation to obtain and maintain securities to satisfy customer claims; in addition, trading restrictions do not affect an entitlement holder's right to receive physical delivery of stock certificates or transfer their position to another brokerage. UCC 8-507 makes a distinction between an intermediary's obligation to execute trades and their obligation to transfer securities or deliver certificates.

If a person holds a security entitlement, the means of disposition is an entitlement order. **An entitlement order includes a direction under section 8-508 to the securities intermediary to transfer a financial asset to the account of the entitlement holder at another financial intermediary or to cause the financial asset to be transferred to the entitlement holder in the direct holding system (e.g., the delivery of a securities certificate registered in the name of the former entitlement holder).**

*See* Revised UCC 8-102 Definitions Official Comment 8 (emphasis added)

5.   The term entitlement order does not cover all directions that a customer might give a broker concerning securities held through the broker. Article 8 is not a codification of all of the law of customers and stockbrokers. Article 8 deals with the settlement of securities trades, not the trades. **The term entitlement order does not refer to instructions to a broker to make trades,** that is, enter into contracts for the purchase or sale of securities. **Rather, the entitlement order is the mechanism of transfer for securities held through intermediaries,** just as indorsements and instructions are the mechanism for securities held directly. In the ordinary case the customer's direction to the broker to deliver the securities at settlement is implicit in the customer's instruction to the broker to sell. The distinction is, however, significant in that this section has no application to the relationship between the customer and broker with respect to the trade itself. For example, assertions by a customer that it was damaged by a broker's failure to execute a trading order sufficiently rapidly or in the proper manner are not governed by this article.

See UCC 8-507 Official Comment 5 (emphasis added)

## 10.  ENERGY SOURCE INC. SECURITIES ARE TRANSFERABLE

Empire Stock Transfer Inc. is the current SEC registered transfer agent for Energy Source Inc., and I confirmed this on June 9, 2011  *See* Exhibit 39.

The CEO of Energy Source Inc. and the transfer agent also confirmed shares are transferable and "street name" holders are eligible to have their BCIT security entitlements exchanged for physical certificates  *See* Exhibits 5 and 38.

## 11.  DTC NON-TRANSFERABLE and GLOBAL LOCK

Energy Source Inc. has a transfer agent and the securities are transferable but the DTC status for BCIT is non-transferable and the DTC status report shows no transfer agent on record. *See* Exhibit 40  2007 "DTC status report".

Although confusing, Energy Source Inc. shares are transferable as defined by securities laws, and according to SEC Rule SR-DTC-2003-09 the DTC's designation of non-transferable does not prevent the withdrawal of certificates.
*See* Exhibit 41.

The cause of the 2005 ten day SEC suspension and the DTC global lock was the deposit of unregistered certificates at the DTC by one or two FINRA members. Those unregistered securities were added to the 645,806 validly issued BCIT securities already on deposit at the DTC and became part of the "fungible bulk"; The DTC removed the unregistered shares and debited the accounts of the FINRA members who deposited them. Then, BCIT, increased the authorized share count to accommodate the obligations brokerages had created in customer accounts.

## 11. DTC NON-TRANSFERABLE and GLOBAL LOCK cont.

The unregistered shares, which now do not exist because they have been physically removed, are equivalent to a "naked short". Naked shorts are a normal course of business for the markets and are "as old as trading itself" *See* Exhibit 42 DTCC press release.

In the multi-level book-entry system, the cure for naked shorts is enforcement of obligations at each level. But in the case of BCIT, brokerages have failed to enforce obligations at their level. According to the DTCC, it has no regulatory authority to enforce settlement of obligations or force brokerages to buy-in, which means a global lock is not a regulatory action. Scottrade's assertion that the global lock prevents Scottrade from settling trades seems to conflict with the public statements made by the DTCC.

> **DTCC has no regulatory authority over trading activity... we have no power to force the closing of an open fail, no matter what the cause, and we do not have the authority to force a buy-in.**

> the underlying reasons why trades fail, information **that is known only to the broker/dealer.**

> A seller's obligation to deliver securities does not go away. And the broker/dealer **who acts as a buyer of securities has a regulatory entitlement and the power -- and, in many cases, an affirmative obligation** after a period of time -- to execute a buy-in on a failed delivery to force the seller to fulfill its obligations.

*See* **Exhibit 42 July 6, 2007 DTCC press release titled:** *DTCC Responds to The Wall Street Journal article "Blame the Stock Vault".* ( emphasis added )

It appears resolution of unsettled trades and obligations is in the hands of the brokerages, who must effect trades broker to broker, and ensure delivery is made. Shares are available directly from Energy Source Inc., and according to the DTCC, brokerages have a "regulatory entitlement" to execute a buy-in, yet, Scottrade continues to claim that the situation is out of their control and it is impossible for them register my shares and deliver a certificate for me.

## 12  CONCLUSION

I have the right to demand Scottrade register my shares and deliver me a physical certificate. Scottrades's failure to comply with my "entitlement order" and physically delivery Energy Source Inc. certificates is a breach of Scottrade's Article 8 obligations UCC 8-507 and UCC 8-508, which is a breach of contract *See* UCC-1-304.

According to the SEC (*See* SEC Staff interpretations on page 5), failure to obtain possession or control can be interpreted as conversion or fraud; and although a damage award for a claim of conversion or fraud might be larger, a breach of contract claim is sufficient in my situation, to cure Scottrade's default. Common stock is easily replaced and not considered unique or one of a kind, consequently, I have requested monetary damages equal to replacement cost rather than specific performance. The DTC status report I have provided as Exhibit 40, states a price for BCIT cusip # 05968X106 as fifteen cents per share, the same price I valued my claim at. *See* Exhibit 40  2007 "DTC Status Report".

State and federal securities laws do protect investors, but only when the laws are enforced. When my claim against Scottrade is enforced, not only will those entrusted with safeguarding funds and securities be held accountable, but the seller, who ultimately received my funds will also be held accountable for his promise.


Respectfully submitted,

*Jan E. Harris-Kimball*

Jan E. Harris-Kimball
PO Box 1387
Philomath, Oregon 97370

## 13. EXHIBITS

Exhibit 36   Policy Perspectives on Revised Article 8 by James S. Rogers, pp 1494-1495

Exhibit 37   July 2009 Mary Shapiro Letter, ( 2 pages)

Exhibit 38   November 2009 Empire Email confirming shares available

Exhibit 39   June 2011 Empire Email confirming current

Exhibit 40   DTC Status  Report

Exhibit 41   SEC Rule SR-DTC-2003-09 pp 1 and 4

Exhibit 42   July 6, 2007 DTCC press release

EXHIBIT 36

adversely affect the interests of individual investors or change current law in a fashion that is prejudicial to the interests of individual investors.

A.   Revised Article 8 Deals with the Custodial Function

Early in this Article, it was noted that to understand clearance and settlement reform initiatives, it is necessary to analyze with some care the different aspects of a securities transaction.  Similarly, to understand the impact of Revised Article 8 on the relationship between customers and their brokers, one must carefully analyze the different roles performed by securities firms.

There are at least three different functions that the firms we call stock-brokers commonly perform for their clients: (1) the investment advisory function, (2) the trade execution function, and (3) the custodial function. For most purposes, there is no occasion to think about the difference among these, nor is there anything about the common sequence in the conduct of a retail transaction that would bring to one's attention the fact that different functions are being performed.  You get a call from your broker giving you a recommendation, you tell the broker that you do want to buy, and a few days later you get a statement showing that the securities have been credited to your account and the purchase price has been debited from the money market account linked to your account where you keep your liquid balances.  It all looks and feels like one simple transaction. There are, however, other common arrangements in which these different functions are performed by different entities.  An investor such as a pension fund, for example, might use A as its investment advisor, B as its broker, and C as its securities custodian. From A, the pension fund obtains advice about what investments to buy, sell, and hold, or the fund may delegate actual decision making authority to A.  From B, the pension fund obtains the service of entering into contracts for the purchase and sale of securities with others through the facilities of the various securities markets and exchanges.  From C, the fund obtains the services of safekeeping of the securities, as well as related services such as monitoring and arranging for the collection of dividends and distributions, watching for calls or conversion opportunities, and the like.[93]  For purposes of Revised Article

93.   Not only are these functions analytically separate, they involve entirely different systems of legal regulation.  A person or firm that provides investment advisory services is subject to regulation under the Investment Advisors Act of 1940.  A firm that acts as a broker, that is, enters into contracts for the purchase or sale of securities as agent for its customer, is subject to regulation as a broker-dealer under the Securities Exchange Act of 1934.  The firms that act as

8, the important point is to distinguish the custodial function from the other roles played by securities firms, for even in an arrangement in which these functions are all performed by the same entity, the indirect holding system rules in Revised Article 8 come into play only with respect to the custodial function.

There is an old quip in the securities business that securities are not bought, they are sold. Much of securities regulation law is a response to the inherent divergence of interest between securities firms and their customers captured, or caricatured, in that quip. A major reason that we need special legal rules to protect investors is that securities firms are salespeople, and they are selling products that are hard to understand and evaluate. Inasmuch as they are paid on commission, there is an obvious potential for divergence of interest between the customer and the firm. That is why securities brokers are carefully regulated, and that is the part of the relationship that remains perennially troublesome. The characteristic disputes between customers and securities brokers that end up in arbitration or litigation arise out of this divergence of interest—customers' contentions that the broker advised them to buy securities that were unsuitable for their investment objectives, or that the broker failed to provide adequate information about the securities or provided inaccurate information, or that the broker "churned" the account to generate commissions, or that the broker exercised discretionary trading authority improperly or without authority. To put it in very colloquial terms, the customer's classic beef is, "You sold me junk."

Suppose that a customer uses two different institutions in securities dealings: Broker provides investment advice and trade execution, but the customer's securities are carried in an account with Custodian. In such an arrangement, the firm in a position to be guilty of "selling junk" is Broker. All that Custodian does is perform the mechanical operation of processing the trades and holding the securities that Broker persuades the customer to buy. If the customer is going to have problems, chances are pretty good that the problem is not going to be that Custodian does not have the securities that Broker persuaded Customer to buy. Quite the contrary, the problem is that Custodian does have exactly the securities that Broker persuaded the customer to buy.

Revised Article 8 has nothing to do with the selling relationship between securities firms and their customers. Thus, enactment of Revised

securities custodians are commonly banks, and hence are subject to regulation under the variety of regulatory schemes that we have in the United States for the various categories of banking institutions chartered under federal and state law.





UNITED STATES
### SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

THE CHAIRMAN

July 20, 2009

The Honorable Charles E. Grassley
Ranking Member
Committee on Finance
United States Senate
Washington D.C. 20510-0702

Dear Senator Grassley:

Thank you for your letter of July 10, 2009, in which you request certain information concerning Bancorp. International Group, Inc. (BCIT), now known as Energy Source, Inc. As you note in your letter, a fraudulent scheme involving the stock of BCIT was the subject of an enforcement action filed by the Securities and Exchange Commission ("Commission") against Mario A. Pino in February 2008 [*SEC v. Pino*, No. 08-cv-353 (D. Ariz.)]. In October 2008, the SEC obtained a default judgment against Mr. Pino in the amount of $426,756, as well as an order prohibiting him from serving as an officer and director of any public company, and from engaging in transactions involving any penny stock.

As a further part of its enforcement efforts against Mr. Pino, the SEC in 2008 brought the facts discovered in its investigation of BCIT to the attention of both federal criminal prosecutors in Phoenix, Arizona and the Internal Revenue Service. On August 12, 2008, Mr. Pino was indicted by a federal grand jury in Phoenix on four counts of income tax evasion. [*U.S. v. Pino*, No. CR08-0895 (D. Ariz.)]. Following his entry of a guilty plea to two counts of the indictment, Mr. Pino was sentenced on July 1, 2009, to a twelve-month federal prison term, to be followed by twelve months of supervised release. Pursuant to the terms of his sentence, Mr. Pino must surrender to the United States Marshal on July 31, 2009.

As to collection efforts on its judgment against Mr. Pino, to date, the SEC has not identified any assets held by Mr. Pino or collected any of its judgment. The SEC has conducted a number of searches and has served several subpoenas in order to ascertain whether Mr. Pino owned real estate or other assets against which the SEC could pursue collection of its judgment. The SEC also sought and was granted the right from the court issuing the judgment to conduct post-judgment discovery in aid of collection, but found no ongoing businesses or income for Mr. Pino. In October 2008, the federal district court in Arizona in which the above-referenced criminal action was pending appointed counsel for Mr. Pino based upon its finding that he had established his financial inability to employ counsel. The SEC will continue appropriate efforts to collect its judgment against Mr. Pino despite his current lack of resources.

The Honorable Charles E. Grassley
Page 2

     Your letter also inquires as to whether the SEC has cleared the shares of BCIT for trading. There is no SEC order currently in effect which would prohibit the trading of BCIT shares, nor is it within the purview of the SEC to clear trading in any particular security. On August 31, 2005, the Commission suspended trading in the securities of BCIT for a period of ten days due to questions regarding the authenticity of the BCIT securities and the accuracy of statements in press releases. That trading suspension elapsed in 2005.

     BCIT is listed under the ticker symbol "BCIT" on the Pink Sheets, operated by Pink OTC Markets, Inc. PinkSheets.com reports no trades in the stock since December 21, 2007. The Depository Trust & Clearing Corp. (the "DTCC"), which is the entity which clears most trades in BCIT, placed a "global lock" on trading, which means that the stock is not eligible for delivery, transfer or withdrawal, shortly before the SEC's trading suspension in 2005. That action was taken in response to evidence received by DTCC that certain of the BCIT shares in the market were not legitimate shares. DTCC has advised the SEC that the global lock remains in effect because BCIT has no one acting as the statutorily-required transfer agent to effect transfers in the shares in compliance with the federal securities laws. Moreover, DTCC has not processed BCIT's June 2008 reverse stock split and name change, in part because the Financial Industry Regulatory Authority ("FINRA") has not recognized that corporate action.

     In addition to the possibility for harm to public investors arising from trading in counterfeit BCIT stock certificates, BCIT is delinquent in filing periodic reports with the SEC which it is required to make under the Securities and Exchange Act of 1934. During the five-year period between November 2000 and December 2005, BCIT did not make any of the required Exchange Act periodic filings. After the events with Mr. Pino occurred, BCIT filed certain periodic reports during 2006 and 2007, but it again became delinquent in its public filings after December 2007 and is currently delinquent. As a result, there is no current information available to prospective buyers of BCIT stock as to the company's assets or operations, if any exist. BCIT therefore may be subject to a Commission action under Section 12(j) of the Exchange Act which would suspend or revoke the registration of its stock and its eligibility for public trading.

     I hope that the information provided above is useful. Please contact me at (202) 551-2126 if I can provide further information.

Sincerely,

Mary L. Schapiro
Chairman

**EXHIBIT  38**

Jan Kimball wrote:
Thanks Matt,

I understand there is a process the company(BCIT) has to perform in order for it's securities to be DRS eligible. Has BCIT initiated that process, and are any of BCIT's shares DRS or DWAC eligible?
If not, does being revoked by the SEC prevent BCIT from becoming eligible?

You suggest that I discuss obtaining certificates with my brokerage, which I will do in the near future, however I am curious what the process is.
A few years ago when I requested and was denied certificates for BCIT from Scottrade, Mr. Megas, said that I could obtain a certificate but that my brokerages had never contacted you (Empire) regarding obtaining a certificate.

When I request that my brokerage obtain certificates, do they contact you or do they go through the DTCC?
I know BCIT is an interesting situation because it is 'globally locked', but for most companies/securities, does a brokerage such as Scottrade, for example, contact you directly when a customer requests certificates?

thanks again,
Jan E. Harris-Kimball
Philomath, Oregon

From:      Matthew J. Blevins (mjb@empirestock.com)
Sent:      Thu 11/19/09 1:44 PM
To:        Jan Kimball (jhk29@hotmail.com)
           1 attachment
mjb.vcf (1.5 KB)

BCIT is not eligible for DRS / DWAC. The application is based on a review at DTC. There is little or no chance BCIT would be eligible. Your shares are at the broker. The process depends on their procedures. Eventually the request will be presented to us and we will cut the physical certificate, assuming the paperwork is in order, and return. You will have to ask your broker as to what their process is.

Thanks,

Matt
--
EMPIRE STOCK TRANSFER INC.
1859 Whitney Mesa Dr.
Henderson, NV 89014
Phone: (702) 818-5898
Fax: (702) 974-1444
Email: mjb@empirestock.com
Web: www.empirestock.com

CONFIDENTIALITY NOTICE: This e-mail and any attached documents contain information which is PRIVILEGED, PROPRIETARY and CONFIDENTIAL, are protected by the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510-2521, Federal and State copyright laws, and are intended only for the use of the recipient(s) named herein. No part of this document or any attachments may be reproduced or transmitted without permission from Empire Stock Transfer Inc. If you are not the intended recipient, you are hereby notified that any disclosure, distribution, or the taking of any action in reliance upon the contents of this communication is strictly prohibited. If you have received this transmission in error, please notify us immediately.

On 6/8/2011 3:34 PM, Jan Kimball wrote:

**EXHIBIT  39**

Matt,

Is Empire Stock Transfer the current transfer agent for Energy Source Inc.?
If not, when did your relationship with Energy Source Inc. end.

Thanks

Jan Kimball


From:    Matthew Blevins (mjb@empirestock.com)
Sent:    Thu 6/09/11 8:09 AM
To:      Jan Kimball (jhk29@hotmail.com)

**We are still the transfer agent.**



> Date: Fri, 3 Aug 2007 09:24:56 -0700
> From: mjb@empirestock.com
> To: jhk29@hotmail.com
> Subject: Re: BCIT cusip number
>
> We were appointed at transfer agent on January 28, 2007. We have not
> been made aware of instructions to deliver shares in any capacity. You
> might try contacting the counsel for the issuer. His contact
> information is as follows:
>
> Irwin Steinhorn
> (405) 272-5750
> or
> Thomas Megas
> (405) 315-5535
> (405) 235-8318
>
> Thanks,
> Matt
>
> EMPIRE STOCK TRANSFER INC.
> 2470 Saint Rose Pkwy, Suite 304
> Henderson, NV 89074
> Phone: (702) 818-5898
> Fax: (702) 974-1444
> Email: mjb@empirestock.com
> Web: www.empirestock.com

DTC Status Report     EXHIBIT 40



EXHIBIT 41

SECURITIES AND EXCHANGE COMMISSION
(Release No. 34-49930; File No. SR-DTC-2003-09)

June 28, 2004

Self-Regulatory Organizations; The Depository Trust Company; Order Granting Approval of
a Proposed Rule Change Relating to Establishing a New Service to Destroy Certain Certificates

I.    Introduction

On June 12, 2003, The Depository Trust Company ("DTC") filed with the Securities and
Exchange Commission ("Commission") a proposed rule change SR-DTC-2003-03 pursuant to
Section 19(b)(1) of the Securities Exchange Act of 1934 ("Act").[1]  Notice of the proposal was
published in the Federal Register on January 23, 2004.[2]  The Commission received ten comment
letters, which are discussed in Section III.  For the reasons discussed below, the Commission is
approving the proposed rule change.

II.    Description

DTC filed this proposed rule change to establish a new service, which DTC calls the
Destruction of Non-Transferable Securities Certificate Program.  The new service will allow
DTC to destroy certain certificates that represent positions in securities for which transfer agent
services are not available and have not been available for six years or longer.  DTC notes that the
issuers of the securities in question are often inactive or insolvent and that the lack of transfer
agent services generally renders the certificates non-transferable.  The new service will reduce
DTC's custodial expenses for such non-transferable securities and will allow participants to
avoid certain fees to which they would otherwise be subject for the ongoing custody of the non-
transferable issues.  The filing also was to implement a DTC fee increase relating to DTC's

---

[1]      15 U.S.C. 78s(b)(1).

[2]      Securities Exchange Act Release No. 49080 (January 14, 2004), 69 FR 3405.

4

that will be searchable both by certificate number and by date of destruction. DTC will retain copies of the computer images of these certificates and of related positional information following destruction of the certificates for at least six years. For at least the first six months after destruction the computer images will be kept in a place that is easily accessible by authorized DTC personnel. Such records will be: (1) available at all times for examination by the Commission or other appropriate regulatory agency in an easily readable projection enlargement; (2) immediately provided upon request by the Commission or other appropriate regulatory agency; (3) arranged and indexed in a manner that permits immediate location of any particular record; and (4) copied and stored separately from any original records.

Participants will be relieved of future DTC fees for any positions that the participant moves to PREM. If at a later date and in the unlikely event that transfer agent services are resumed for a security issue where the depository has already destroyed certificates, DTC will use its best efforts to have the destroyed certificates replaced and to return the position to the appropriate participants.

(6) Withdrawing Certificates. Alternatively, a participant may wish to withdraw its position in an issue of non-transferable securities certificates that is subjected to the custody fee which is described below. DTC will attempt to honor the participants' requests for participants if certificates in proper denominations are available in DTC's inventory. If proper denominations are not available, which as a practical matter may typically be the case, DTC will hold a certificate of greater value than that represented by the participant's long position and will charge the participant fees as described below.

(7) Checking for Issues of Non-Transferable Securities Certificates. Participants can systemically identify issues of non-transferable securities certificates by accessing either the

**EXHIBIT  42**

July 6, 2007 DTCC PRESS RELEASE

DTCC Responds to The Wall Street Journal article "Blame the 'Stock Vault?"

DTCC has no regulatory authority over trading activity... we have no power to force the closing of an open fail, no matter what the cause, and we do not have the authority to force a buy-in.

Our job is to protect the safety and soundness of the system, by ensuring this trade data is processed, ownership records are changed and financial obligations between trading parties are settled.  As for enforcement of the securities laws, however, this is a matter for the governmental regulators and the SROs.  DTCC provides the SEC and the markets with data on the results of trading activity, and it is left to them to enforce the law.

As for delivery failures in particular, there are SEC and SRO rules setting forth the responsibilities of brokers.  ...the regulatory authorities do indeed have "mechanisms" to enforce the delivery rules.  From the perspective of DTCC, however, in addition to not having enforcement powers, we do not know whether a sale is long or short -- certainly not whether it is "naked."

While the term "naked short selling" may be new, the practice of abusive shorting by failing to deliver is as old as trading itself.

It ignores that naked short selling is a trading strategy and has nothing to do with the post-trade clearance and settlement process.  It ignores that we do not know the underlying reasons why trades fail, information that is known only to the broker/dealer.  It ignores the fact that DTCC is not the "keepers of the systems where it happens," since this implies DTCC has regulatory authority over trading parties, which by federal statute or federal regulation it does not.

A seller's obligation to deliver securities does not go away.  And the broker/dealer who acts as a buyer of securities has a regulatory entitlement and the power -- and, in many cases, an affirmative obligation after a period of time -- to execute a buy-in on a failed delivery to force the seller to fulfill its obligations.  In a buy-in, the broker/dealer failing to receive the securities essentially purchases the undelivered stock from some other broker, with the selling broker/dealer who failed to deliver having to absorb any difference in price or other costs incurred on the buy-in.

See July 6, 2007 DTCC press release titled: *DTCC Responds to The Wall Street Journal article "Blame the Stock Vault".* ( emphasis added )
http://www.dtcc.com/news/press/releases/2007/wsj_response.php